*This opinion is subject to revision before final publication in the Pacific Reporter.*

**2013 UT 44**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellee,*

*v.*

REINALDO CANTON,
*Defendant and Appellant.*

No. 20110835
Filed July 23, 2013

Third District, Salt Lake
The Honorable Robin W. Reese
No. 09190587

Attorneys:

John E. Swallow, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

Peter Daines, Salt Lake City, for appellant

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE DURHAM, and JUSTICE PARRISH joined.

JUSTICE LEE, opinion of the Court:

¶1 Reinaldo Canton was arrested in Utah in April 2007 and indicted on federal charges of coercion and enticement of a fifteen–year-old girl. Canton, a New Mexico resident, was released and returned to New Mexico to await trial. He remained there pending trial for over two years, though he returned to Utah on a few occasions to attend proceedings in federal court. After the federal charges were dismissed in May 2009, Canton was charged by the State of Utah with enticement of a minor under Utah Code section 76-4-401.

¶2 Canton moved to dismiss the charge based on the applicable two-year statute of limitations. In so doing, he disputed the applicability of our criminal tolling statute, which tolls the limita-

tions period while a criminal defendant is "out of the state." *See* UTAH CODE § 76-1-304(1). In Canton's view, this provision was inapplicable because he was "legally present" in Utah during the course of the federal court proceedings, in that he cooperated with federal authorities and appeared in various proceedings in the federal district court. Canton argued in the alternative that application of the tolling provision violated the Uniform Operation of Laws provision of the Utah Constitution. The district court denied Canton's motion. Canton filed this appeal.

¶3    We affirm. The criminal tolling statute applies to Canton because its text leaves no room for his notion of "legal presence." And applying the statute to Canton does not run afoul of the Uniform Operation Clause, as Canton fails to show how any classification under the statute discriminates against him in an impermissible manner.

I

¶4    In March 2007, Reinaldo Canton, a New Mexico resident, began corresponding online with an undercover federal agent posing as a fifteen-year-old girl. Canton engaged the agent in sexually-explicit conversation and ultimately arranged to meet the "girl" for sex at the Layton Hills Mall in Utah. When Canton arrived at the mall on April 11, 2007, FBI agents and representatives of the Utah Internet Crimes Against Children Task Force arrested Canton. Soon thereafter, federal officials charged Canton with coercion and enticement for illegal sexual activity under 18 U.S.C. § 2422(b). On April 19, 2007, a federal magistrate in Utah released Canton and allowed him to return to New Mexico to await trial on the federal charges.

¶5    During the course of the next fifteen months, federal officials in New Mexico monitored Canton and reported to their counterparts in Utah. Canton cooperated with the investigation against him and traveled several times from New Mexico to Utah to attend proceedings in federal district court. On July 29, 2008, Canton suffered an aortic dissection (a tear in a large blood vessel branching off of the heart), which required surgical intervention. Thereafter, Canton claimed he was too ill to continue traveling to Utah and filed a motion to dismiss based on his deteriorating health. The federal court granted this motion without prejudice on May 14, 2009.

¶6    Less than two months later, on June 30, 2009, the State of Utah charged Canton with enticement of a minor under Utah Code section 76-4-401. The state charge was based on the same 2007 conduct that led to the filing of federal charges.

¶7    Canton moved to dismiss under the two-year statute of limitations applicable to the enticement charge, Utah Code section 76-1-302. The district court denied the motion, concluding that the limitations period had been tolled under Utah Code section 76-1-304(1) because Canton had been "out of the state" in New Mexico during the course of the federal prosecution against him. In denying the motion, the district court rejected Canton's assertion that his "legal presence" in Utah foreclosed application of the tolling provision. It also upheld the applicability of that provision against Canton's challenge under the Uniform Operation Clause of the Utah Constitution. Canton entered a conditional guilty plea, reserving his right to challenge the application of the tolling statute on appeal.

II

¶8    Canton contends that the district court erred in applying our criminal tolling provision, which tolls the statute of limitations while a criminal defendant is "out of the state," *see* UTAH CODE § 76-1-304(1). While Canton concedes that he was in New Mexico during the course of the federal prosecution, he offers two grounds for overcoming the tolling provision. He first asserts that the tolling statute is inapplicable as long as a defendant maintains a "legal presence" within the state. In the alternative, he argues that application of the tolling provision violates the "uniform operation" of laws provision in article I, section 24 of the Utah Constitution.

¶9    Both points turn on questions of law, which we review for correctness. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, __ P.3d __. We reject both of Canton's arguments and accordingly affirm.

A. Statutory Construction of "Out of the State"

¶10 Under our criminal tolling statute, "[t]he period of limitation does not run against any defendant during any period of time in which the defendant is out of the state following the commission of an offense." UTAH CODE § 76-1-304(1). The question before us concerns the meaning of the phrase "out of the state." Both

sides agree that Canton was physically "out of the state" (in New Mexico) for most of the two years in which the limitations period is claimed to have run. Yet they disagree about the significance of that fact.

¶11  For the State, Canton's physical presence in New Mexico is dispositive, as it reads "out of the state" to refer to a defendant's absence from the state's territorial boundaries. Canton sees the matter differently. He interprets "out of the state" to refer to a more abstract construct. In his view a person is not "out of the state" if he is subject to its legal authority — in the sense of cooperating with federal officials investigating criminal charges in Utah and appearing at federal court proceedings there. Thus, for Canton the notion of "out of the state" refers not to the state's physical boundaries but its sovereign power. For him a person is not "out of the state" if he remains subject to its sovereign authority.

¶12  We read the statute as the State does. We interpret "out of the state" to focus on the question of a person's *physical* presence within the state's territorial boundaries. Thus, we reject Canton's abstract construct of *legal* presence, both as a matter of (a) the "ordinary meaning" of statutory language consisting of "common, daily, nontechnical speech," *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (internal quotation marks omitted), and (b) under the possibility that the statute may employ a "legal term of art . . . with a settled meaning in the law," *Hansen v. Hansen*, 2012 UT 9, ¶ 19, 270 P.3d 531.

### 1. Ordinary Meaning of "Out of the State"

¶13  In determining the ordinary meaning of nontechnical terms of a statute, our "starting point" is the dictionary. *See Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶ 19, __ P.3d __. "A dictionary is useful in cataloging a range of possible meanings that a statutory term may bear." *Id.* (citing HENRY M. HART, JR., ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1375–76 (William N. Eskridge, Jr. & Phillip P. Frickey eds., 1994) [hereinafter HART & SACKS]). "It provides 'an historical record, not necessarily all-inclusive, of the meanings which words in fact have borne.'" *Id.* (quoting HART & SACKS, at 1190). "Such a record, however, will often fail to dictate 'what meaning a word *must* bear in a particular context.'" *Id.* (quoting HART & SACKS, at 1190). "That question will often require

further refinement—of selecting the best meaning among a range of options, based on other indicators of meaning . . . ." *Id.*

¶14  This is one of those cases where the dictionary fails to dictate the meaning that the statutory terms "must bear" in this context. The operative phrase has two component parts—a function term ("out of") and its object ("the state"). And dictionary definitions of both sets of terms leave the statute semantically open to both parties' interpretations.

¶15  The phrase "out of" is used "as a function word" in a range of different senses. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1603 (2002). One sense "indicate[s] direction or movement from an enclosed space to the outside," or "direction, motion, or distance from a . . . starting point." *Id.* To illustrate this meaning, the dictionary lists examples of a child who "fell out of the crib," a person who "took his hands out of his pockets," or one who "hit the ball out of the park." *Id.* This sense of "out of" seems in line with the State's construction of the tolling statute. It connotes relational movement from a certain baseline, typically a physical one.

¶16  That said, this definition does not exclude the possibility of a metaphysical "space" or "starting point" from which something moves "out of." And some common uses of the phrase unquestionably have an abstract referent. An argument can be "out of bounds" by dint of its exceeding the governing rules of propriety and not any physical boundary, just as a technical advancement can be "out of this world" in a figurative sense without the assistance of space travel. So this dictionary meaning of "out of" is itself insufficient to resolve the interpretive question before us.

¶17  And the dictionary also includes another definition that is more clearly in line with Canton's position. "Out of" is also used "as a function word to indicate removal or situation away from the effective action of some faculty or agency." *Id.* Here, moreover, the listed examples expressly encompass "removal" from an *abstract* "faculty or agency," as in "the ships fled *out of* range," "he was soon *out of* sight," and "*out of* hearing." *Id.* Thus, the dictionary's range of meanings for "out of" give no basis for limiting the statutory phrase to either *physical* or *abstract* absence; both constructs fall within standard dictionary definitions.

¶18 Dictionary definitions of "the state" are similarly indeterminate. The referenced "state" could certainly be the physical territory of the State of Utah, marked by its legal borders. *Id.* at 2228 (defining "state" to include "a territory" governed by a particular nation or sovereign). But the "state" is also defined as an abstract authority—as in "the operations, activities, or affairs of the government or ruling power of a country: the sphere of administration and supreme political power of a government," or "the embodiment of the ethical idea and the moral will of the community." *Id.*

¶19 The State's notion of "out of the state" partakes of the first definition listed above. A person can be said to be "out of the state" in the sense of being physically outside of its territorial boundaries. But the latter definitions are in line with Canton's construction. A person could be said to be "out of the state" in the sense of being removed from its political power or sphere of influence.

¶20 Dictionaries are accordingly insufficient by themselves to resolve the interpretive task before us. We must look elsewhere to determine the ordinary meaning of the language of the tolling statute. Specifically, we must look beyond the dictionary definitions of the component terms of the statute to consider the ordinary meaning of the complete statutory phrase, "out of the state."[1]

---

[1] *See* John F. Manning, *The Eleventh Amendment and the Reading of Precise Constitutional Texts*, 113 YALE L.J. 1663, 1704 (2004) ("[O]ne can properly attribute to legislators the reasonable minimum intention 'to say what one would ordinarily be understood as saying, given the circumstances in which it is said.' This principle, it should be noted, does not direct interpreters to follow the literal or dictionary meaning of word or phrase. To the contrary, it demands careful attention to the nuances and specialized connotations that speakers of the relevant language attach to particular words and phrases in the context in which they are being used." (internal quotation marks omitted)); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand, J.) ("Of course it is true that the words used, even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing: be it a statute, a contract, or anything else. But it is one of

¶21 A first resort for selecting among a range of meanings left open by the dictionary is the structure and context of the statutory language. *See Olsen*, 2011 UT 10, ¶ 12. In *Olsen* we interpreted the terms of Utah Code section 63G-7-202, a provision calling for reimbursement of attorney fees incurred by a government employee when the request is "filed in the manner" provided in other sections of the code. *Id.* ¶ 6. We noted that dictionary definitions of "manner" encompassed both of the alternative constructions proffered by the parties—that under "[c]ommon dictionary definitions of the term 'manner' arguably could encompass just the *form* of an employee's written request," or the term "could be construed . . . to encompass the timing requirements set forth in" the code. *Id.* ¶ 12 (footnote omitted). Yet we explained that "[t]he fact that the statutory language may be susceptible of multiple meanings does not render it ambiguous," as "'all but one of the meanings is ordinarily eliminated by context.'" *Id.* ¶ 13 (quoting *Deal v. United States*, 508 U.S. 129, 131–32 (1993). And in *Olsen* we found that one of the meanings of "manner" was eliminated by the context of section 63G-7-202, as the latter notion of "manner" could not be adopted "without undercutting the express language" of the statute. *Id.* ¶ 18. So we adopted the former notion of "manner" as the one "more consistent with the language and structure of the statutory scheme." *Id.*

¶22 Canton purports to find a parallel ground for his construction of our criminal tolling statute. He insists that the State's notion of physical presence "contradicts the legislative purpose of the statute," which in his view is to preserve the "balance between an individual's interest in repose and the State's interest in having sufficient time to build its case." And in light of his full cooperation with federal authorities during the pendency of the federal case against him here, Canton insists that the State's side of the ledger was a null set, as the State had "sufficient time to investigate its case and file charges, notwithstanding [his] absence from the state." Thus, Canton asks us to dismiss the State's construction as incompatible with the purpose of the criminal tolling provision as he sees it.

---

the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary . . . .").

¶23 Canton's position falters in its premise. The tolling statute, like most legislative enactments, is multi-dimensional in its purpose. *See VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 20, 293 P.3d 290 (dismissing a legislative purpose argument as a "vast over-simplification," noting that "most legislation . . . is not aimed at advancing a single objective at the expense of all others, but instead is a result of a legislative give-and-take that balances multiple concerns" (internal quotation marks omitted)). Undoubtedly it is aimed at balancing the concerns that Canton identifies. But it also implicates other considerations, chief among them a concern for certainty.[2]

¶24 Certainty is at a premium in this area. The time-preclusive effect of a statute of limitations is strong medicine. It cuts off a presumptively viable claim on the sole basis of the passage of time. Thus, our statute of limitations jurisprudence is aimed not only at balancing repose on one hand and an opportunity to prepare a case for filing on the other, but also at fostering certainty and avoiding unfair surprise.[3] The tolling statute must also be understood to advance that concern. And that concern is advanced by the State's objective notion of physical presence—and undercut by Canton's more abstract construct—in that the latter approach would require subjective, case-by-case weighing of factors informing the degree to which an individual may be "present" in the state in the sense of being subject to its authority. For these and other reasons,[4] we cannot properly reject the State's po-

---

[2] *See Jacobs v. Hafen*, 917 P.2d 1078, 1081 (Utah 1996) (explaining that a statute of limitations "must be fixed so that parties can order their affairs with predictability," and that "parties need a time certain within which they can assert their ownership rights").

[3] *Id.*; *see also Johnson v. Nedeff*, 452 S.E.2d 63, 67–68 (W. Va. 1994) (rejecting a request to read an equitable exception into a statute of limitations because "[d]efendants have a right to rely on the certainty the statute provides, and adoption of the rule plaintiff urges would destroy that certainty," which would be out of keeping with "the legislative intent underlying such provisions").

[4] Canton's argument also fails even under the more narrow statutory purpose that he identifies. The State may have had sufficient time to investigate and press charges during the pendency of the federal charges. But that does not exhaust its legitimate law-enforcement interest in considering charges against an out-of-state

sition—or endorse Canton's—on the ground that only Canton's advances the purpose of the criminal tolling statute.

¶25 We must accordingly look elsewhere to select from the range of meanings left open by the dictionary. Here we can do so by moving beyond the component terms of the statute—"out of" and "state"—and considering the full phrase in its entirety. *See FCC v. AT&T, Inc.*, 131 S.Ct. 1177, 1183 (2011) (noting that "two words together may assume a more particular meaning than those words in isolation").

¶26 Dictionaries typically define only individual words, not extended phrases. So we cannot look up "out of the state" in a dictionary. But that does not foreclose the possibility of identifying its ordinary meaning. We can do so by considering the way the full phrase is typically used in common parlance.[5]

---

defendant subject to pending federal charges. State officials could rationally determine to await the outcome of the federal prosecution to decide whether to pursue parallel state charges—as an out-of-state defendant could be seen as a lesser threat than an in-state one, particularly in circumstances where the anticipated federal penalty might effectively vindicate the state's concerns for protecting the interests of its citizens.

[5] *See Carranza v. United States*, 2011 UT 80, ¶ 24, 267 P.3d 912 (plurality opinion of Lee, J., joined by Durrant, J.) (interpreting "minor child" in Utah Code section 78-11-6 to include a fetus based, in part, on the fact that "the term 'child' is used extensively in the popular press to refer to the unborn"); *id.* ¶ 35 (dissenting opinion of Nehring, J.) (asserting the need for "caution against overreliance on dictionaries" and asserting that "since 1851, the term 'minor child' has appeared in the pages of the [*New York*] *Times* 2,866 times without ever referring to a fetus"); *see also Muscarello v. United States*, 524 U.S. 125, 129 (1998) (interpreting federal sentencing enhancement for one who "carries a firearm" in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1), in light of results of online search of "computerized newspaper databases," which included "thousands of . . . sentences" using the phrase to "convey the meaning at issue here, *i.e.,* the carrying of guns in a car"); *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012) (interpreting the crime of "habor[ing]" an illegal alien under 8 U.S.C. § 1324(a)(1)(A)(iii) in light of results of a Google search of

¶27 Here that inquiry confirms the State's construction of the tolling statute and rules out Canton's. When the phrase "out of the state" is used in its full context, it refers to the physical territory of a state, not its political power or influence.[6] So although Canton's construction is semantically plausible based on dictionary definitions of "out of" and "the state," it cannot be reconciled with the uniform understanding of the extended statutory phrase "out of the state." That phrase is not used in the way that Canton construes it, and we reject it on that ground.

### 2. "Out of the State" as a Legal Term of Art?

¶28 That leaves the question whether the tolling statute's language may consist of a legal term of art. The legislature is entitled to invoke specialized legal terms that carry an extra-ordinary meaning. And when it does so we credit the legal term of art, not the common understanding of the words. *See Hansen*, 2012 UT 9, ¶ 19. Thus, "when a word or phrase is 'transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'" *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)). Canton reads the criminal tolling provision to incorporate a term of art "transplant" from our caselaw. Citing cases decided under our civil tolling statutes, *Snyder v. Clune*, 390 P.2d 915 (Utah 1964); *Lund v. Hall*, 938 P.2d 285 (Utah 1997), he asserts that our law has adopted a principle of "legal" presence for tolling purposes—a

---

the term "harboring" in connection with terms like "fugitives" and "refugees," and noting that the results show that the word as "actually used" in this context "has a connotation . . . of deliberately safeguarding members of a specified group from the authorities").

[6] This conclusion is based on results of a Google News search, http://news.google.com, considering 150 instances in which the phrase "out of the state" was used in news stories published in May 2013—27 of which involved references to the relationship between a person and the state. Not one of those 27 relevant references use "out of the state" in a manner involving absence of a person from the legal authority or influence of a state. Every single one of them makes unequivocal reference to the physical confines of a state.

principle purportedly incorporated by reference in the criminal tolling provision at issue here.

¶29 Canton reads too much into *Snyder* and *Lund*—and not enough into the operative text of the criminal tolling statute. *Snyder*, to be sure, interpreted the text of the civil tolling provision in light of the "objective of the statute"—of "prevent[ing] a defendant from depriving a plaintiff of the opportunity of suing him by absenting himself from the state during the period of limitation." 390 P.2d at 916. And in light of that purpose the *Snyder* court held that a nonresident motorist defendant who had by law appointed the Secretary of State as his agent for service of process was "not 'absent' from the state in the sense contemplated" by the civil tolling statute. *Id.* (quoting the 1953 version of the civil tolling provision, UTAH CODE § 78-12-35, in light of the nonresident motorist act, UTAH CODE § 41-12-8); *see also Lund*, 938 P.2d at 289 (interpreting the then-applicable civil tolling statute, UTAH CODE § 78-12-35, in light of the nonresident motor vehicle act, UTAH CODE 41-12a-505). But *Snyder* and *Lund* do not evidence a firmly rooted, omnibus notion of legal absence in our statute of limitations jurisprudence. As we explained in *Olseth v. Larsen,* 2007 UT 29, 158 P.3d 532, these cases are based on a narrow construction of the unique terms of the civil tolling statute in a narrow band of cases (under the Nonresident Motor Vehicle Act). *Id.* ¶¶ 29–36.

¶30 *Olseth* considered a question certified to us by the Tenth Circuit Court of Appeals: "Is the statute of limitations tolled under [the general civil tolling statute] when a person against whom a claim has accrued has left the state of Utah and has no agent within the state of Utah upon whom service of process can be made instead, but the person is amenable to service pursuant to Utah's long arm statute[?]" *Id.* ¶ 1. We held that the statute was tolled, and in so doing rejected the invitation to adopt a broad reading of *Snyder* and *Lund*.

¶31 Our *Olseth* opinion emphasized that *Snyder* and *Lund* were driven by the terms of the Nonresident Motor Vehicle Act—specifically, by the provision calling for appointment of the Secretary of State as agent of a nonresident motorist for service of process. *Id.* ¶¶ 29–36. Thus, in *Olseth* we explained that "the defendants in th[o]se cases [were] not 'absent' from the state because *their agent* [was] present and service [could] be effected within the state." *Id*. ¶ 29 (emphasis added). At the same time, we declined

to extend this principle to other cases (not implicating the Nonresident Motor Vehicle Act). For "cases not involving a statutorily appointed agent, or not involving an agent within Utah," we adopted a notion of physical (not legal) presence; we held that "an out-of-state defendant is deemed 'absent' from the state and the tolling statute tolls the applicable statute of limitations." *Id.*

¶32 *Olseth* thus disproves the term-of-art notion of legal presence advocated by Canton. It indicates that we do not have an omnibus rule tying tolling to a person's susceptibility to service of process. And it also defeats Canton's position in this case, as Canton does not and cannot contend that he had an agent for service of process in Utah—only that he was loosely subject to the authority of the State as evidenced by his cooperation in the federal proceedings against him. That is insufficient under our law, which leaves no room for the construction that Canton attributes to the criminal tolling provision.

### B. Constitutionality of the Tolling Statute

¶33 Our only remaining task is to consider Canton's challenge to the constitutionality of the tolling statute's application in this case. His challenge arises under article I, section 24 of the Utah Constitution, the Uniform Operation Clause.

¶34 That clause requires that "[a]ll laws of a general nature shall have uniform operation." UTAH CONST. art I, § 24. Historically, uniform operation provisions were understood to be aimed not at legislative *classification* but at practical *operation*.[7] Thus, at the

---

[7] *See* G. ALAN TARR, UNDERSTANDING STATE CONSTITUTIONS 197–99 (1998) (explaining that uniform operation provisions were not understood historically as "miniature equal protection clauses" regulating legislative classifications, but as protection against the "creation of special privileges or exemptions" in the operation or application of general laws); ROBERT F. WILLIAMS, THE LAW OF AMERICAN STATE CONSTITUTIONS 209–13 (2009) (noting that uniform operation clauses originally reflected an "opposition to favoritism and special treatment for the powerful," and explaining that "[a]lthough these provisions may seem to overlap somewhat with federal equal protection doctrine, closer scrutiny reveals significant differences," in that such state provisions do "not seek

time of the ratification of the Utah Constitution, parallel provisions in other state constitutions were not viewed as a limit on the sorts of classifications that a legislative body could draw in the first instance, but as a rule of uniformity in the actual application of such classifications—a requirement of consistency in application of the law to those falling within the classifications adopted by the legislature, or in other words a prohibition on special privileges or exemptions therefrom.[8]

¶35 The modern formulation of uniform operation is different. It treats the requirement of uniform operation as a state-law counterpart to the federal Equal Protection Clause. Our cases articulate a three-step test for enforcing this guarantee. First we assess "what classifications the statute creates." *See State v. Angilau*, 2011 UT 3, ¶ 21, 245 P.3d 745. We then assess "whether different classes . . . are treated disparately." *Id.* (alteration in original) (internal quotation marks omitted). And finally, "if there is disparate treatment between classes," we assess "whether the legislature had any reasonable objective that warrants the disparity." *Id.* (internal quotation marks omitted).

¶36 This last step incorporates varying standards of scrutiny. *See State v. Robinson*, 2011 UT 30, ¶ 22, 254 P.3d 183. Those standards recognize that most classifications are presumptively permissible, and thus subject only to "rational basis review." *Id.* Our

---

equal protection of the laws" but rather guard against "discrimination in favor of a minority").

[8] *See*, *e.g.*, *People ex rel. Smith v. Judge of The Twelfth Dist.*, 17 Cal. 547, 554–56, 563 (1861) (upholding a law against a challenge under a constitutional provision identical to Article I, Section 24 of the Utah Constitution even though that law created a category of one, explaining that the "expression . . . that . . . laws of a general nature shall be uniform *in their operation*" only extended to "persons standing in the same category" (internal quotation marks omitted)); *Driggs v. State*, 38 N.E. 882, 884 (Ohio 1894) (explaining, under Ohio's Uniform Operation Clause, that a law's "uniformity consists in the fact that no person or thing of the description of any person or thing affected by it is exempt from its operation," since uniformity concerns the law's "operation upon the persons or things of any class upon whom or which it purports to take effect" (internal quotation marks omitted)).

standards of scrutiny also recognize, however, that other classifications are so generally problematic (and so unlikely to be reasonable) that they trigger heightened scrutiny. *Id.* (noting that discrimination on the basis of a "suspect class" (e.g., race or gender) triggers heightened scrutiny, as do classifications implicating "fundamental right[s]").[9]

¶37 Canton presents no viable constitutional challenge to the application of the tolling provision to this case. The historical requirement of consistent application or enforcement (or its concomitant bar on special privileges or exemptions) is not at all implicated here, as Canton's gripe is that the statute sweeps *too* broadly—in encompassing defendants who are "out of the state" physically but still subject to its authority (and thus purportedly outside the rational reach of the tolling statute). That concern, in fact, runs precisely counter to that of the historical domain of uniform operation, which was to prescribe broad, uniform application across the entirety of a legislative class, or in other words to foreclose special privileges or exemptions from enforcement. And Canton's claim is similarly deficient under the modern formulation of uniform operation set forth in our caselaw, as he fails to

---

[9] In formulating the applicable standards of scrutiny, our cases generally incorporate principles from the federal equal protection regime, *see, e.g., Blue Cross & Blue Shield of Utah v. State*, 779 P.2d 634, 637 (Utah 1989), while reserving the right to depart from those standards in an appropriate case in the future, *see, e.g., State v. Drej*, 2010 UT 35, ¶ 33, 233 P.3d 476. Yet our precedent to date has offered little basis or explanation for the extent of any difference between the federal equal protection guarantee and the state requirement of uniform operation. And the parties herein have not ventured anything along those lines in their briefs. So we have no occasion here to elaborate on any difference between the federal equal protection and state uniform operation provisions. *See State v. Arguelles*, 2003 UT 1, ¶ 123 n.26, 63 P.3d 731 (declining to break new constitutional ground on the issue of whether the "Utah Constitution requires the exclusion of victim impact evidence" because the litigant did no more than "restate[] arguments" from an earlier case, where the court had declined to consider the issue "because the briefs inadequately presented any arguments supporting [the] assertion").

attack the only classification drawn by the tolling statute (between those who leave the state after committing a crime and those who remain within it), and takes issue instead with the statute's failure to draw *additional* or *different* classifications.

¶38 Canton's gripe is with the legislature's failure to sub-classify—to draw further distinctions between compliant and non-compliant out-of-state defendants. He asserts that these two sub-classes are fundamentally different, and thus that it is uncon-stitutional to treat them similarly.

¶39 That is not a viable, standalone basis for a uniform opera-tion challenge. Our uniform operation standards are focused on examining the rationality of the classifications that *were made* by the legislature. *See Angilau*, 2011 UT 3, ¶ 21 (explaining that we begin by asking "what classifications the statute creates"). And concerns of over-inclusiveness, like the one raised by Canton, are relevant only insofar as they bear on the question whether the classification that was made clears the applicable standard of scru-tiny.[10] Thus, even those litigants whose gripe is that the legislature has impermissibly grouped them into a category with other dis-similar individuals must demonstrate that the classification that put them there fails constitutional muster. Canton fails to do so, opting to question only what further sub-classifications the legis-lature *might have* made.

---

[10] As Canton indicates, our prior opinions have sometimes re-ferred to the principle that "persons in different circumstances should not be treated as if their circumstances were the same." *See Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984); *see also Gallivan v. Walker*, 2002 UT 89, ¶ 31, 54 P.3d 1069; *Lee v. Gaufin*, 867 P.2d 572, 577 (Utah 1993). But that principle is merely reflective of the fact that over-inclusiveness considerations inform the determination whether particular classifications clear the applicable standard of scrutiny. *See, e.g., Lee*, 867 P.2d at 577 n.6 (invoking this principle immediately before noting that "every legislative act is in one sense discriminatory" and explaining that a "classification is nev-er unreasonable or arbitrary in its inclusion or exclusion features so long as there is some basis for the differentiation between clas-ses . . . included as compared to those excluded from its opera-tion" (internal quotation marks omitted)).

¶40 In any event, the viability of the classification drawn by the legislature in the criminal tolling statute is beyond reproach. The governing standard of review is rational basis, as there is no suspect classification at work and no apparent fundamental right. (Canton vaguely suggests that the tolling statute bears on his right to travel, but fails to identify any component of that right that is in any way implicated, *see State v. Chettero*, 2013 UT 9, ¶ 15, 297 P.3d 582 (setting forth three components of the right), so he fails to provide a basis for heightened scrutiny.) And the rationality of the statute's classification is quite apparent. As explained above, there are ample grounds for treating criminal defendants who are physical absent from the state different from those who remain here. *Supra* ¶ 24 n.4. So the statute's classification is rational and its application is accordingly constitutional.

———————