Chief Justice DURRANT,
concurring in part and concurring in the judgment:
36 I concur in the majority's affirmance of the court of appeals' judgment and in all of the majority's analysis-exeept the portion addressing Justice Lee's corpus linguistics interpretive method. While I too would decline to use that method in this case, I applaud Justice Lee for his thoughtful explora- - tion of corpus linguistics as a potential additional tool for our statutory interpretation tool box. I am open to the possibility that in certain cases it may well prove useful in our assessment of the ordinary meaning of statutory terms.[1] But I do not consider it neces *1270 sary in this case, because I find the majority's analysis of the meaning of the term "discharge," an analysis conducted using our long-established methods of statutory construction, to be compelling.[2] And I would further note that although the dictionary alternatively defines "discharge" as "to. shoot" or "to unload," [3] the former definition applies specifically to firearms while the latter seems to encompass the more general concept of unloading cargo or emptying a container.[4] Granted, the cartridge of a firearm is in some sense a "container" that can be "unloaded," but in the context of a statute that involves firearms, I am confident the legislature intended the term "discharge" to mean "to shoot," not. "to unload." So unlike Justice Lee, I do not believe this is a case where the dictionary "fails to dictate the meaning that the statutory terms must bear." [5] f
T37 Further, I am concerned about our use of corpus linguistics in a case where it has not been argued by the parties.[6] Now, it is certainly true, that we may, and often have, employed dictionaries, canons of construction, or other tools for statutory interpretation that have not been argued by the parties.[7] But primary linguistics research seems to me a step removed from these traditional tools. I fear that a sua sponte venture into such territory may be fraught with the potential for error.[8] I think this is illustrated by Justice Lee's critique of the flaws in Judge Posner's sua sponte attempt at such research.[9] The fact that a jurist of Judge Posner's intellect and stature is capable of such missteps suggests to me that, even in those cases where corpus linguistics may be a useful addition to our traditional methods of statutory construction, it would be best employed by us, or by other judges, only after the parties have raised it and argued it.[10] This would allow the respective sides in the dispute to challenge each other's database, methodologies, and conclusions.
*1271 1138 Finally, in our exploration of whether or when corpus linguistics should play a role in our interpretation of statutes, it is important that we weigh the potential usefulness of the approach against its potential cost. In some cases, the linguistic analysis may be sufficiently complicated that an expert would be required.[11] This would be an unfortunate cost to add to the already-too-expensive litigation process. But I think that in other cases the lawyers could themselves conduct the linguistic analysis, outline their methods and conclusions in their briefs, and present argument as to why we should adopt their approach over their opponents'. few judges and, perhaps, even fewer members of the bar are familiar with corpus linguistics, I believe it is simply too soon to know whether the benefits of using this new tool warrant the increased expense. Because
1389 Finally, I wish to make clear that while I would not employ Justice Lee's corpus linguistics analysis in this case for the reasons I have specified, and because of other concerns I have not discussed here nor resolved for myself, I look forward to our continued debate in this area. Should we elect to embark down this path, we should tread slowly and cautiously. And caution dictates that this potential method of statutory interpretation be fully tested in the eruci-ble of the adversarial process, rather than simply applied sua sponte by our court.
LEE, A.C.J.; concurring in part 5nd concurring in the judgment.

. I consider the assessment of a term's ordinary meaning to be an important tool, but not the only tool, in the process of statutory interpretation. See Marion Energy, Inc. v. KFJ Ranch P'ship, 2011 UT 50, ¶ 14, 267 P.3d 863. But I do not believe such an assessment should displace our central objective in interpreting statutes-the ascertainment of legislative intent. See, e.g., L.G. v. State (In re A.T.), 2015 UT 41, ¶ 16, 353 P.3d 131 ("With any question of statutory interpretation, our primary goal is to effectuate the intent of the Legislature."). Rather, I apply the presumption, which I consider to be a common-sense one, that the legislature intends that words be understood in statutes as they are ordinarily used, unless there are indicia to the contrary. See Marion Energy, 2011 UT 50, ¶ 14, 267 P.3d 863. As examples of such indicia, our caselaw indicates that specialized usage, statutory definitions, or *1270 the structure of the statute itself can all show that the legislature did not intend to use a word according to its ordinary meaning. See, e.g., State v. Bagnes, 2014 UT 4, ¶ 13, 322 P.3d 719 (noting that because a word was not "defined by statutel,] [wle must accordingly look elsewhere to 'derive its meaning-to either the ordinary mearﬁngrof the word, or to its technical sense as a legal term of art"" (footnote omitted)); State v. Canton, 2013 UT 44, ¶ 21, 308 P.3d 517 (noting that "all but one of the meanings" of a statutory term could be "eliminated by context" (internal quotation marks omitted)). I do not see the use of corpus linguistics as inconsistent with this approach.

. See supra 110 (noting that we look to the ordinary meaning of statutory terms as well as "'the act as a whole, the act's operation, and its purpose"" when interpreting statutory language); supra T 12-15 (examining the dictionary definition of discharge and the structure and context of the unlawful discharge statute to conclude that the term "discharge" as used in the statute means "to shoot").

. See infra "47; see also Tmr Amamrican Hrrimace Dictionary 514 (5th ed.2011).

. See Ter AmBrican Dictionary, supra, at 514 (defining "discharge" as "[t]o relieve (a ship, for example) of a burden or of contents; unload"). &

. See infra 147 (internal quotation marks omitted).

. Cf. State v. Baker, 2010 UT 18, ¶ 57, 229 P.3d 650 (declining to address an issue in an "unsettled" area of the law because the court was "without the benefit of adversarial briefing on the subject").

. See Patterson v. Patterson, 2011 UT 68, ¶ 18, 266 P.3d 828 (noting that "we are unwilling to disregard controlling authority that bears upon the ultimate resolution of a case"); Kaiserman Assocs., Inc. v. Francis Town, 977 P.2d 462, 464 (Utah 1998) ("We should not be forced to ignore the law just because the parties have not raised or pursued obvious arguments."); see also Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983) (noting that although courts in an adversarial system "are not precluded from supplementing the contentions of counsel through [independent] deliberation and research," courts "will not remedy [a] defect" where "counsel has made no attempt to address the issue" and the issue involves "important questions of far-reaching significance" (internal quotation marks omitted)).

. +See Tomy McenEry & Anprew Harpi®, Corpus Lin-cutsrics: Merson, THrory, anp Practice 14 (2012) (noting that if one "approach[es] a corpus with a specific theory in mind, it can be easy to unintentionally focus on and pull out only the examples from the corpus that support the theory').

. See infra % 82-83.

. I should note that in my own examination of Justice Lee's search on the corpus linguistics website, I found no such flaws and did find his search to be both replicable and transparent.

. See Pavt Baker, Usinc Corpora in Discourss Anatysts 18 (2006) ("[Clorpus data does not interpret itself, it is up to the researcher to make sense of the patterns of language which are found within a corpus."); cf. State v. Rothlisberger, 2006 UT 49, ¶ 20, 147 P.3d 1176 (noting that lay witnesses are not competent to offer testimony that is based upon "scientific; technical, or other specialized knowledge" internal quotation marks omitted)).