*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 25**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DANIELLE BARRANI, *et al.*,*
*Appellants,*

*v.*

SALT LAKE CITY,
*Appellee.*

No. 20240346
Heard December 11, 2024
Filed July 31, 2025

On Direct Appeal

Third District Court, Salt Lake County
The Honorable Andrew H. Stone
No. 230907360

Attorneys*:

Eric Boyd Vogeler, Salt Lake City, Stephen W. Tully,
Ilan Wurman, Phx., Ariz., for appellants

---

* Additional appellants: Kadri Barrani; Liesa Covey; Scott Evans; Jim Grisley; Juan Gutierrez; Clotilde Houchon; David Ibarra; and Randy Topham.

Additional attorneys for *amicus curiae*, in support of appellants: John P. Mertens, Salt Lake City, for Goldwater Institute.

Additional attorneys for *amicus curiae*, in support of appellee: Jason M. Groth, Salt Lake City, Julie A. Murray, Wash., D.C., Bridget Lavender, Scout Katovich, N.Y.C., N.Y., for American Civil Liberties Union, American Civil Liberties Union of Utah, National Homelessness Law Center, and Crossroads Urban Center; Maria Michelle Uzeta, Berkeley, Cal., for Disability Rights Education and Defense Fund and Disability Law Center; Freyja Johnson, Mikayla Irvin, Bountiful, for International Municipal Lawyers Association.

Katherine R. Nichols, Salt Lake City, for appellee

———————

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

———————

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1    A group of residents who live or operate businesses throughout Salt Lake City (Residents) bring this action against Salt Lake City (the City) alleging the City's failure to eliminate encampments created by unsheltered people on the City's public land is interfering with their use and enjoyment of their neighboring properties. Residents claim the City has a duty in its capacity as a landowner to maintain its properties free of nuisance. The City counters that Residents seek to use the court to force the City to use its enforcement powers in a specific way, and that under the public duty doctrine, Residents cannot establish the elements of nuisance because the City has no duty associated with its failure to use those powers.

¶2    This court has long recognized the public duty doctrine as a crucial protection that allows government actors to perform their public duties without fear of civil liability. The public duty doctrine is not without limitation, but it clearly applies to preclude a party's claims when a party alleges a government actor has failed to perform duties it owes to all members of the public. Here, we hold that the public duty doctrine precludes Residents' claims of public and private nuisance and that no special relationship exists that would exempt Residents' claims from that preclusion. We affirm the district court's dismissal with prejudice.

## BACKGROUND[1]

¶3    Residents, who live or operate businesses throughout the City, including in the Ballpark, Central City, East Central, Pioneer Park, Gateway, and State Street areas, filed an action for public and

———————

[1] Because this case is before us on a grant of a motion to dismiss, we take as true all facts alleged in the complaint. *See Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224.

private nuisance against the City. To varying degrees, Residents allege that behaviors of the unsheltered communities near their homes and places of business negatively affect their use and enjoyment of their properties.

¶4 Residents expressed in their complaint that at times, they feel like "prisoners in their own homes," unable to utilize their properties due to threats from unsheltered people. Unsheltered people have allegedly robbed them, and Residents have observed unsheltered people "openly inject[ing] themselves with drugs in the public right of way in front of their homes and leav[ing] the needles and other residue," breaking down private fences, and using private water sources to bathe and wash clothes.

¶5 One Resident claims she is "regularly confronted with drug addled and/or mentally ill individuals roaming the neighborhood," often yelling and threatening to assault her. Her car and patio have been broken into, and her building has been set on fire in an "attempt[] to break into the apartments of vacating tenants."

¶6 Other Residents and their employees have at times confronted unsheltered people attempting to break into their businesses or steal property from them. One business-owner Resident regularly arrives at work to find twenty to thirty people "camped out on his property." Other Resident business owners allege unsheltered people regularly defecate on the floors of their businesses, break windows, steal property, and litter. And other Residents have installed costly security systems to prevent theft and trespassing by unsheltered people. Another Resident business owner has encountered unsheltered people "setting fires" and "openly masturbating in his parking lot" and "having sex there."

¶7 Residents filed a complaint in district court alleging the City created both a public and private nuisance by allowing "unsheltered [people] to engage in public camping." They claim the City has adopted a policy of allowing vagrancy and public camping on its public land, and that this policy has resulted in increased "public urination, public defecation, public use of illegal drugs (including fentanyl and heroin) on [City] property, trash accumulation, violent acts on and around [City] land, and invasion and destruction of neighboring property."

¶8 Residents asked the district court to "enter a preliminary and permanent injunction directing the [City] immediately to take all steps necessary to abate the nuisance," or, "[i]n the alternative,"

asked "that the court issue a writ of mandamus requiring [the City] to abate the public nuisances on its streets, sidewalks, easements, and parks."

¶9 The district court ruled that the public duty doctrine precluded Residents' claims and dismissed their complaint with prejudice. It concluded that Residents "failed to allege that the City breached a duty owed specifically to them, rather than [a] duty owed to the public at large, or that there existed a special relationship between them and the City." The court ruled that "[t]he City owed no duty to the [Residents] individually apart from its general duty to enforce laws and to protect the public." The court reasoned that "the facts pled showing that [Residents] have a higher likelihood of [negative] encounters and impacts [from unsheltered people] are a quantitative matter—they do not allege any qualitative difference in [Residents'] situations such that they can be considered to be in a different class than other city residents and visitors." Residents appeal.

## STANDARD OF REVIEW

¶10 The parties ask us to address whether the public duty doctrine applies to preclude Residents' public and private nuisance claims against the City. We review the district court's "grant of a motion to dismiss for correctness, granting no deference to the decision of the district court."[2]

## ANALYSIS

¶11 Residents allege the City's failure to eliminate unsheltered people's encampments on City-owned land abutting their private properties amounts to a public and private nuisance.[3] They allege

---

[2] *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275.

[3] As an initial point, we stress that Residents are bound by the terms of their pleading. *See Larsen v. Davis Cnty. Sch. Dist.*, 2017 UT App 221, ¶ 39, 409 P.3d 114; *see also Utah Stream Access Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 42, 439 P.3d 593 ("[T]he court lacks the power to second-guess the pleading decisions of the parties . . . ."). At oral argument, Residents stated, "We did not ask for a city-wide declaration and that is not the relief that we are asking for. We are asking specifically in the areas where these encampments pop up that are adjoining or are in sufficient proximity such that these individual plaintiffs would have

(continued . . .)

the encampments limit their use and enjoyment of their properties, and that if the City required unsheltered people to clear their encampments from City-owned public property, Residents' use and enjoyment of their land would be restored. The City asserted below that the public duty doctrine barred Residents' nuisance claims. The district court agreed.

¶12   Under the public duty doctrine, "a plaintiff cannot recover for the breach of a duty owed to the general public, but must show that a duty is owed to him or her as an individual."[4] We have made clear that the public duty doctrine does not preclude tort claims against governmental actors that commit affirmative acts, and "applies only to the omissions of a governmental actor" engaged in performing public duties.[5]

¶13   Additionally, the public duty doctrine does not preclude tort claims against government actors for injuries "to persons who stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor."[6] A special relationship will "impose[] a specific duty of care toward the plaintiff as an individual that is distinguishable from a public duty owed to the general public."[7]

¶14   But absent a special relationship, the public duty doctrine bars a plaintiff's tort claim for "the breach of a duty owed to the general public."[8] This means there could be instances where a private party would be liable for an omission, but a government

---

standing to assert the public nuisance." But in their complaint, Residents requested "a court order instructing the City to abate the nuisances that it has created . . . on public lands for which it is responsible." We will address Residents' arguments within the scope of relief they requested in their complaint, and we will not address the adjustments they purported to make to their pleadings at oral argument.

[4] *Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 12, 342 P.3d 243 (cleaned up).

[5] *Id.* ¶ 2.

[6] *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 11, 125 P.3d 906, *overruled on other grounds by Cope*, 2014 UT 53, ¶¶ 19–27.

[7] *Cope*, 2014 UT 53, ¶ 12.

[8] *Id.* (cleaned up).

actor engaged in the same omission as part of his duties to the public would not have a duty for nuisance purposes under the public duty doctrine.

¶15 We begin by clarifying the relationship between the common law public duty doctrine and the public duty doctrine as codified in the Utah Code. Next, we define the scope of the public duty doctrine and determine that the doctrine bars Residents' claims. We then analyze whether any special relationship exists between Residents and the City that would create an exception to the public duty doctrine's bar on liability. Finding no special relationship, we affirm the district court's dismissal of Residents' claims.

## I. THE GOVERNMENTAL IMMUNITY ACT DID NOT ABROGATE THE PUBLIC DUTY DOCTRINE

¶16 At the outset, we clarify, and all parties agree, that the Governmental Immunity Act (GIA) did not abrogate the common law public duty doctrine, and that the 2014 amendment to the GIA codified the doctrine.[9] We first recognized the public duty doctrine in our 1971 decision *Obray v. Malmberg*,[10] and we have "consistently applied the doctrine" for over fifty years.[11] In April 2014, our legislature amended the GIA to include the following provision:

---

[9] *See* Public Duty Doctrine Amendments, S.B. 250, 2014 Leg., Gen. Sess. (Utah 2014) (enacting UTAH CODE § 63G-7-202(5)). In their brief, Residents asked us to abandon the public duty doctrine. But at oral argument, they conceded the GIA amendment precludes that outcome. We walk through the legislature's codification of the common law public duty doctrine to clarify its status for the benefit of the public.

[10] 484 P.2d 160, 162 (Utah 1971) (holding a public sheriff not liable for damages for failure to investigate an alleged crime, explaining that the failure was "not pursuable by an individual since the public official's duty is to the public,—he being accountable to and removable in a proper proceeding, by the public" (cleaned up)).

[11] *See Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 17, 342 P.3d 243 (citing *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 16, 125 P.3d 906, *overruled on other grounds by Cope*, 2014 UT 53, ¶¶ 19–27; *Day v. State ex rel. Utah Dep't of Pub. Safety*, 1999 UT 46, ¶ 11, 980 P.2d 1171;

(continued . . .)

> A general duty that a governmental entity owes to the public does not create a specific duty to an individual member of the public, unless there is a special relationship between the governmental entity and the individual member of the public.[12]

¶17  Then in our opinion *Cope v. Utah Valley State College*, issued shortly after the legislature amended the GIA to include this provision, we reaffirmed that the public duty doctrine had not been abrogated.[13] We stated in *Cope* that the legislative addition to the GIA "appears to be a statutory endorsement of the special relationship exception to the public duty doctrine" and not a replacement of our existing caselaw.[14]

¶18  The 2014 amendment's legislative history supports this conclusion. During the House floor debate on the amendment, the floor sponsor, Representative Kay McIff, stated that the amendment "simply codifies" the special relationship doctrine that "is built within our common law."[15] And before a Senate committee, Steve Walkenhorst, an assistant attorney general, speaking at the invitation of bill sponsor Senator Curtis Bramble, further stated that the sponsors "want to maintain the status quo. . . . The public duty doctrine has served the government[]

---

*Rocky Mountain Thrift Stores Inc. v. Salt Lake City Corp.*, 887 P.2d 848, 852 (Utah 1994); *Madsen v. Borthick*, 850 P.2d 442, 444 (Utah 1993); *Ferree v. State*, 784 P.2d 149, 151–52 (Utah 1989), *overruled on other grounds by Scott v. Universal Sales, Inc.*, 2015 UT 64, ¶¶ 17–32, 356 P.3d 1172; *Christenson v. Hayward*, 694 P.2d 612, 612–13 (Utah 1984) (per curiam); *Obray*, 484 P.2d at 161–62).

[12] Public Duty Doctrine Amendments, S.B. 250, 2014 Leg., Gen. Sess. (Utah 2014) (enacting UTAH CODE § 63G-7-202(5)).

[13] 2014 UT 53, ¶¶ 14–17.

[14] *Id.* ¶ 16 n.3. Because the statute was not retroactive to the time of the underlying injury in *Cope*, we declined to interpret the amendment. *Id.*

[15] *Public Duty Doctrine Amendments: H. Floor Debate*, S.B. 250, 2014 Leg., Gen. Sess. (Utah Mar. 13, 2014) (statement of Representative Kay McIff) (available at https://le.utah.gov/av/floorArchive.jsp?markerID=88313).

well . . . ."[16] Thus, we interpret the legislature's amendment as an affirmation of the public duty doctrine as it already existed in our caselaw.

¶19 Having confirmed the vitality of the public duty doctrine as described in our caselaw and codified at subsection 63G-7-202(5) of the Utah Code, we now turn to defining the public duty doctrine's scope and explaining its application.

## II. THE PUBLIC DUTY DOCTRINE SHIELDS GOVERNMENT ACTORS FROM LIABILITY WHEN THEY ALLEGEDLY FAIL TO PERFORM A PUBLIC DUTY

¶20 The public duty doctrine, which precludes claims against government actors for "failure to perform a public duty, or an inadequate or erroneous performance [of a public duty],"[17] exists to encourage public servants to conduct their duties without fear of unwarranted civil recourse.[18] It "is based on the policy determination that when a governmental entity assumes a duty to protect the general public from harms . . . , holding the entity liable for a breach of this duty would cause municipalities to be mired hopelessly in civil lawsuits for every infraction of the law."[19]

¶21 The first step in applying the public duty doctrine is to determine "whether a plaintiff's theory of liability rests upon a public duty."[20] Public duties are those owed to the public at large, such as law enforcement services, police protection, fire protection,

---

[16] *Public Duty Doctrine Amendments: Hearing on S.B. 250 Before S. Bus. & Lab. Comm.*, 2014 Leg., Gen. Sess. (Utah Mar. 3, 2014) (statement of Steve Walkenhorst, Asst. Att'y Gen.) (available at https://le.utah.gov/av/committeeArchive.jsp?timelineID= 56604); *see also State v. Canton*, 2013 UT 44, ¶ 28, 308 P.3d 517 (recognizing that "when a word or phrase is transplanted from another legal source, . . . it brings the old soil with it" (cleaned up)).

[17] *Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 24 n.5, 342 P.3d 243 (cleaned up).

[18] *See id.* ¶ 12; *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 11, 125 P.3d 906, *overruled on other grounds by Cope*, 2014 UT 53, ¶ 2.

[19] *Cope*, 2014 UT 53, ¶ 12 (cleaned up).

[20] *Id.* ¶ 30.

and protection from natural disasters.[21] Because public duties "deal[] generally with the welfare of all," when the government engages in them, it generally "does so without a duty to anyone."[22]

¶22 "A public duty need not extend to the entire world" to qualify for protection under the public duty doctrine, but it must be a duty owed to all members of the public within a public actor's domain.[23] For example, a university police department would have a public duty to secure the safety of any staff, students, or visitors to the university campus.[24] And the "duties of firefighters and police officers, which are clearly public obligations, end at the border of the city or county that they serve."[25]

¶23 If a plaintiff's allegations are based in a public duty, we must then determine whether they are specifically based on a failure to perform that public duty. We have made clear that the public duty doctrine will only preclude claims against government actors based on "passive inaction"—in other words, "a failure to take positive steps to benefit others, or to protect them from harm not created by any wrongful act of the [government actor]."[26] The public duty doctrine does not apply to preclude claims against government actors whose "active misconduct work[s] positive injury to others."[27]

¶24 With that framework in place, we address whether the public duty doctrine precludes Residents' claims that the City has failed to eliminate unsheltered people's encampments on City-owned land.

III. THE PUBLIC DUTY DOCTRINE BARS RESIDENTS' CLAIMS

¶25 The district court concluded that Residents "failed to allege that the City breached a duty [it] owed specifically to them,

---

[21] *See id.* ¶ 31.

[22] *Cannon v. Univ. of Utah*, 866 P.2d 586, 589 (Utah Ct. App. 1993).

[23] *Cope*, 2014 UT 53, ¶ 32.

[24] *Id.*

[25] *Id.*

[26] *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 7, 275 P.3d 228 (cleaned up).

[27] *Id.* (cleaned up).

rather than [a] duty owed to the public at large." It stated that Residents' allegations center on "the inadequacy of police protection and enforcement." Specifically, it ruled that its decision was consistent with the court of appeals' opinion in *Lamarr v. Utah State Department of Transportation*,[28] stating that "like [the plaintiff in] *Lamarr*, [Residents] have failed to establish that the City owes them a special duty to remedy or 'control' unsheltered encampments beyond that owed to the general public."

¶26 We agree with the district court that the duty Residents allege the City has breached through inaction is one it owes to the public at large. Thus we conclude that the public duty doctrine applies to preclude Residents' claims, and we further hold that the City's status as a "landowner" does not alter that conclusion.

*A. Residents' Allegations Are Based on the City's Failure to Adequately Perform Public Duties*

¶27 Residents claim that the City's inaction is not based on a duty it owes to the public at large because "[t]he City does not *need* to use its police force" to eliminate the nuisance. They argue that the City can "choose[] to use its police force to abate the nuisance, or instead use[] civil code enforcers or other municipal employees or contractors" to resolve Residents' concerns—"it is up to the City." They acknowledge that "third parties *might* resist, or might fail to comply" and "the City *might* have to use its law enforcement mechanisms in some instances," but that this possibility does not trigger the public duty doctrine and bar their claims.

¶28 But any actions the City could take stem from powers the City has as a government actor, not as an ordinary landowner. There is no City action, whether carried out by employee, agent, or some other form of City enforcement, that would effectively eliminate unsheltered people's encampments unless it were based in the authority the City holds as a government actor. Even the Residents' suggestion of simply asking unsheltered people to leave public property requires enforcing the City's Municipal Code—an ordinary member of the public could make that request, but it ultimately would have to rely on the City for enforcement authority. Because the City has a duty to exercise its enforcement authority for the benefit of all residents, the City's alleged failure to

---

[28] 828 P.2d 535 (Utah Ct. App. 1992).

exercise that authority in the way Residents demand is subject to the public duty doctrine.

¶29 We agree with the district court that the court of appeals' opinion in *Lamarr* bolsters this conclusion.[29] Like the present case, *Lamarr* addressed whether the public duty doctrine precluded a plaintiff's claims against a city defendant for harms committed by unsheltered people on public land.[30] In *Lamarr*, a car struck a plaintiff while he was walking across an overpass.[31] That plaintiff said he chose to take the overpass instead of using the pedestrian walkway because he had been "frightened and harassed by [unsheltered people] who had congregated under the overpass" during an earlier walk.[32] He claimed his alternative path was "necessary to avoid harassment and possible physical violence by the [people] congregated around the stairway leading to the walkway," and that the city "negligently failed to properly 'control' [unsheltered people] under the overpass."[33]

¶30 The court of appeals held in *Lamarr* that under the public duty doctrine, "the City owed no duty to [the plaintiff] to 'control'" unsheltered people.[34] It explained that the public duty doctrine "has been defined as 'a duty to all is a duty to none,'" and that "if the City owed no duty to [the plaintiff] apart from its duty to the general public, [the plaintiff] cannot recover."[35] We agree with the court of appeals' holding.

¶31 Residents attempt to distinguish the present case from *Lamarr* based on the relationship they claim the City has with Residents here. They argue that in *Lamarr*, "there was 'no evidence the City had any knowledge whatsoever of either of [the plaintiff's] trips across the overpass'" and thus the City had no "reason to distinguish [the plaintiff] from the general public."[36] But Residents

---

[29] *See id.*

[30] *See id.* at 536–40.

[31] *Id.* at 536.

[32] *Id.*

[33] *Id.* at 536–37 (cleaned up).

[34] *Id.* at 538.

[35] *Id.* at 539 (cleaned up).

[36] (Quoting *id.* at 540.)

do not claim that the public duty here is any different from that in *Lamarr*, only that the special relationship here distinguishes Residents from the *Lamarr* plaintiff. We address whether a special relationship exists below.[37] But we see no reason to distinguish the City's alleged duty in *Lamarr* to control unsheltered people on public land from that same alleged duty here.

> B. *The Public Duty Doctrine Precludes Claims Against the City for Inaction Even When the City Is "Acting as a Landowner"*

¶32 Adjacent to their argument that eliminating public encampments does not require the City to exercise enforcement authority, Residents attempt to bifurcate the City's duties into two categories: its public duties that may fall under the public duty doctrine, and its ordinary duties as a landowner that Residents argue fall outside of public duty doctrine protection. Residents urge us to frame the duty the City owes them as that of any private landowner, and to hold that even though the City is a government actor and a public landowner, it has the same non-unique duty to maintain its land free of nuisance that all private landowners have. They argue "landowners can be liable for the nuisance-creating activities of third parties, and there is no exemption for municipalities."

¶33 The line Residents seek to draw between the City's duties to the public and its duties as a landowner incorrectly frames the public duty doctrine. It focuses on the harm experienced by the plaintiff instead of the duty owed by the government actor. The fundamental and singular inquiry that determines whether the public duty doctrine precludes a plaintiff's claim is whether the government actor's inaction stems from a public duty. At its core, the public duty doctrine seeks to protect government actors from liability for failure to perform a duty they owe to everyone. And we conclude that the doctrine bars Residents' claims here.

IV. NO SPECIAL RELATIONSHIP EXISTS BETWEEN RESIDENTS AND THE CITY

¶34 Residents contend that even if the public duty doctrine would otherwise bar Residents' claims, they meet the special relationship exception to the doctrine "because their land adjoins the nuisances, inflicting harms unique to them as neighbors."

---

[37] *See infra* Part IV.

"[T]he special relationship exception to the public duty doctrine serves a similar function to the tort principle that a private individual generally has no duty to act to rescue another from harm unless there is a special relationship that creates such a duty."[38] "A governmental actor can create a special relationship, where one did not previously exist, by her acts."[39]

¶35 Residents claim a special relationship with the City based on their proximity to City property. They claim that "those who own, live, or work on property adjoining the particular City lands at issue" are a "set of people" negatively impacted by the encampments apart from the rest of the general public. But, as the district court points out, they "do not delineate geographic proximity or [what] special injury [is] required for entry into this select club." Residents claim property interests in various parts of the City. As the district court highlights,

> Two plaintiffs reside on 800 East between 300 and 400 South. One plaintiff lives near the Gateway district. Another has a business between 400 and 500 West on

---

[38] *Cope v. Utah Valley State Coll.*, 2014 UT 53, ¶ 25, 342 P.3d 243. "Special relationship" has two meanings in tort: one as it applies to "persons who may be entitled to recover in tort from governmental actors" and another to describe "the class of persons who may be owed a duty arising from another's failure to act under general tort law principles." *Webb v. Univ. of Utah*, 2005 UT 80, ¶ 12, 125 P.3d 906, *overruled on other grounds by Cope*, 2014 UT 53. Black's Law Dictionary defines special relationship as "[a] nonfiduciary relationship having an element of trust, arising esp[ecially] when one person trusts another to exercise a reasonable degree of care and the other knows or ought to know about the reliance." *Relationship*, BLACK'S LAW DICTIONARY (12th ed. 2024). It further defines the "special-relationship doctrine" as "[t]he theory that if a state has assumed control over an individual sufficient to trigger an affirmative duty to protect that individual . . . , then the state may be liable for the harm inflicted on the individual by a third party." *Special-Relationship Doctrine*, BLACK'S LAW DICTIONARY (12th ed. 2024). "Thus, identical terminology is used to describe two tort concepts that, while very different, occupy domains just close enough to one another to promote confusion." *Webb*, 2005 UT 80, ¶ 12.

[39] *Webb*, 2005 UT 80, ¶ 14.

> 600 South, near Pioneer Park. Another has a business in the Ballpark neighborhood. One has a business on West 200 South, another a property on East 200 South, and one a business on the 1000 block of State Street.

¶36 Residents do not meet their burden to show they "stand so far apart from the general public that we can describe them as having a special relationship to the governmental actor."[40] Virtually all residents of Salt Lake City, landowners and renters alike, "adjoin" City-owned land—including sidewalks, medians, public parks, and roads. And as Residents point out, these encampments and the unsheltered people who live in them are transient. A Resident with a claim against the City based on their status as adjoining an encampment today may not have a claim tomorrow. And the inverse is true: a City resident miles away who may not have ever had an encampment adjoin their land could have a claim tomorrow. But it, too, could be gone the next day. As the district court put it, "[t]he effects of permitting [unsheltered people] to establish encampments, with [their] allegedly attendant crime and unsanitary conditions, are not limited to specific proximity of the [Residents'] homes and businesses."

¶37 Beyond the lack of definable parameters setting Residents apart from any other adjoining landowner in the City, the City has not done anything to reach out to Residents that would create a special relationship with them. The City has not caused Residents "personal injury . . . or physical harm to [their] land or chattels," the kind of harm that "is normally different in kind from that suffered by other members of the public."[41] And the City's failure to abate the alleged nuisance in the way and within the timing Residents think is best does not transfer blame from the third parties causing those injuries and harms to the City.

¶38 Looking back to *Lamarr*, Residents seek to distinguish themselves from the plaintiff in that case by stating that "there was 'no evidence the City had any knowledge whatsoever of either of [the plaintiff's] trips across the overpass'" that led to his injury and thus the City had no "reason to distinguish [the plaintiff] from the

---

[40] *Id.* ¶ 11.

[41] RESTATEMENT (SECOND) OF TORTS § 821C cmt. d (AM L. INST. 1979, Oct. 2024 update).

general public."[42] But knowledge of a plaintiff alone does not create a special relationship. That the *Lamarr* plaintiff "had not set himself apart" was not the issue. A government actor, through its own affirmative actions, is the only party that can create a relationship that could give rise to liability; a plaintiff cannot force a special relationship simply by making himself known to the government actor.

¶39 We agree with the district court that Residents do not differ from the general public when it comes to the secondary effects of unsheltered people's encampments, because the specific harms Residents allege to be a nuisance here can affect any member of the public just as they are affecting Residents. Being the first to assert in court this publicly held injury does not allow Residents to claim a special relationship and circumvent the public duty doctrine.

## CONCLUSION

¶40 We acknowledge the difficult realities that Residents are experiencing due to the actions unsheltered people are taking on and near their properties. But our sincere sympathy to those difficulties cannot dictate how we apply the law. Both the legislature and this court have made clear that the public duty doctrine exists to preclude claims against government actors for any alleged failure to adequately perform their public duties. And a failure to exercise public authority is precisely what Residents allege here. Residents have not shown that the City owed them any unique duty beyond what it owes to all people within City limits. We thus affirm the district court's dismissal with prejudice of Residents' public and private nuisance claims.

––––––––––––

[42] (Quoting *Lamarr v. Utah State Dep't of Transp.*, 828 P.2d 535, 540 (Utah Ct. App. 1992).)