[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Athens v. McClain*, Slip Opinion No. 2020-Ohio-5146.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-5146

THE CITY OF ATHENS ET AL., APPELLANTS, *v.* MCCLAIN, TAX COMMR., ET AL., APPELLEES.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Athens v. McClain*, Slip Opinion No. 2020-Ohio-5146.]

*Home Rule Amendment—General Assembly acted within its constitutional authority when it enacted laws centralizing the administration of municipal net-income taxes in 2017 Am.Sub.H.B. No. 49 ("H.B. 49")—Portion of H.B. 49 that allows the state to retain .5 percent of the collected municipal net-income taxes as a fee or a tax for the state's centralized administration is not constitutionally authorized.*

(Nos. 2019-0693 and 2019-0696—Submitted May 13, 2020—Decided November 5, 2020.)

APPEALS from the Court of Appeals for Franklin County, Nos. 18AP-144 and 18AP-189, 2019-Ohio-277.

_____

**DONNELLY, J.**

{¶ 1} Many Ohio municipalities impose a tax on income earned within their boundaries. When that tax is applied to businesses, it is known as a net-profits tax. Appellants, the cities of Athens, Akron, and Elyria, and numerous other cities and villages, all of which impose a net-profits tax, challenge the General Assembly's enactment of laws that centralize the collection and administration of those taxes. Additionally, some of the appellants challenge the portion of the law that allows the state to retain .5 percent of the collected taxes as a fee or a tax for the state's centralized administration.

{¶ 2} The contested legislation permits municipal net-profits taxpayers (other than sole proprietors) to elect to have the Ohio Department of Taxation administer their net-profits-tax obligations with respect to all the municipalities in which the taxpayer incurs those obligations. Appellants contend that the legislation violates their home-rule authority and exceeds the General Assembly's constitutional power to limit the power of municipalities to levy taxes.

{¶ 3} We conclude that the laws imposing centralized administration constitute an act of limitation within the General Assembly's explicit constitutional authority, and we affirm the portion of the court of appeals' judgment upholding the centralized-administration system. The law providing for the state's retention of .5 percent of municipal net-profits taxes is a different matter. Because the retention provision amounts to the imposition of a fee or a tax and because imposing a fee or a tax does not constitute an act of limitation, this provision exceeds the General Assembly's authority. We therefore sever the .5-percent-retention provision and reverse the portion of the court of appeals' judgment upholding that portion of the legislation. We also remand the cause to the Franklin County Court of Common Pleas.

2

## I. BACKGROUND

### A. Municipal income taxes and the General Assembly's power to limit municipal taxation

{¶ 4} Toledo enacted the first municipal income tax in Ohio in 1946, Ohio Legal Center Institute, *Ohio Taxation,* Chapter 17, at 316 (1967), and in upholding that tax as a valid exercise of home-rule authority, we specifically noted that the power of municipalities to tax is subject to preemption by the General Assembly, *Angell v. Toledo*, 153 Ohio St. 179, 91 N.E.2d 250 (1950), paragraph one of the syllabus. According to the Tax Foundation, 649 Ohio municipalities currently impose income taxes. https://taxfoundation.org/local-income-taxes-2019 (accessed July 24, 2020) [https://perma.cc/6HWJ-PEEX].

{¶ 5} In 1957, the General Assembly first exercised its power to limit municipal income taxation by enacting R.C. Chapter 718. Am.Sub.S.B. No. 133, 127 Ohio Laws 91. As originally enacted, R.C. Chapter 718 mandated a uniform tax rate, required municipalities to get voter approval before they could impose a higher rate, and immunized certain income from municipal taxation. Former R.C. 718.01, 137 Ohio Laws at 91-92. Over the years, R.C. Chapter 718 has been expanded to make municipal taxation more uniform, with the goal of making it easier for taxpayers to comply.

{¶ 6} In 2014, the General Assembly enacted 2014 Sub.H.B. No. 5 ("H.B. 5"), which established greater statewide uniformity of municipal income taxes by explicitly preempting municipalities from imposing an income tax unless they adopted, by ordinance or resolution, the provisions of R.C. Chapter 718 and levied the tax in accordance with those provisions, R.C. 715.013 and 718.04(A).

### B. Enactment of centralized administration

{¶ 7} In 2017, the General Assembly enacted 2017 Am.Sub.H.B. No. 49 ("H.B. 49"), which added new sections to R.C. Chapter 718—R.C. 718.80 through 718.95—and those sections provide for a centralized administration of municipal

net-profits taxes. R.C. 718.80 authorizes municipal net-profits taxpayers to "elect to be subject to" those newly enacted sections "in lieu of the provisions set forth in the remainder of [R.C. Chapter 718]." Simply put, these taxpayers have the option to select the new method of centralized administration.[1]

{¶ 8} Before H.B. 49 was enacted, businesses had to file returns with and pay taxes directly to the municipalities to which they had net-profits-tax obligations. Or if one or more of those municipalities contracted for tax-administration services with an agency, such as Cleveland's Central Collection Agency or the Regional Income Tax Agency, the businesses would file and pay their municipality taxes on a composite basis to the respective agency. Businesses also had the option to submit their municipal tax filings and payments electronically, through the Ohio Business Gateway.

{¶ 9} Under the statutes enacted by H.B. 49, any business taxpayer may continue to file its return with and pay its taxes to each municipality, as it did in the past, or it may file a composite return with the state tax department and make its estimated and final payments to that department, which in turn determines the business's municipal net-profits liabilities for all municipalities, issues any assessment for deficiencies, processes all refund claims, and arranges through the state director of budget and management for tax amounts to be remitted to the appropriate municipalities on a monthly basis.

{¶ 10} The statutes enacted by H.B. 49 require the municipalities and the tax department to exchange information related to local tax liability of taxpayers that elect to file a composite return with the state. For their part, municipalities must annually certify their tax rates and any increase in those rates to the tax department. R.C. 718.80(C)(1). Additionally, within 90 days of receiving notification of a taxpayer's election to have the state administer its municipal taxes,

---

1. "Natural persons" are excluded from the definition of "taxpayer" for purposes of electing centralized administration, so only business entities have the option. R.C. 718.81(C).

the municipalities must submit information to the tax commissioner regarding the taxpayer's net operating losses and carryforwards, its municipally granted credits and carryforwards, its overpayment carryforwards, and any other information the municipality deems relevant to the state's determination of the taxpayer's liability. R.C. 718.80(C)(2). If a city or village fails to comply with these requirements, the tax commissioner must notify the state director of budget and management, who is required to withhold 50 percent of the amount due to that municipality "until the municipal corporation complies." R.C. 718.80(C)(3).

{¶ 11} For its part, the state has the obligation, each May and November, to provide the municipalities with a list of taxpayers that filed returns with the tax department and that had income apportionable to the particular municipality; the list must include (1) each taxpayer's name, address, and federal identification number, (2) each taxpayer's apportionment ratio for and amount of income apportionable to the municipality, (3) the amount of net operating loss carryforward used by each taxpayer, (4) whether the taxpayer requested that overpayments be carried forward, and (5) the amount of tax credits claimed under R.C. 718.94. R.C. 718.84(B). Additionally, within 30 days of the state's distribution of tax funds to the municipality, the tax commissioner must provide the municipality with a list naming each taxpayer that made estimated payments attributable to that municipality and the amount of the payment. R.C. 718.84(C).

{¶ 12} A municipality that discovers additional information that could result in a change to the taxpayer's liability may make a referral to the tax commissioner for an audit of the taxpayer. R.C. 718.84(F)(1). And if a municipality "believes that the commissioner has violated the commissioner's fiduciary duty as the administrator of the tax levied by the municipal corporation," it may seek a writ of mandamus. R.C. 718.84(F)(4).

{¶ 13} To defray the cost of state-level administration of municipal net-profits taxes, R.C. 718.85(B) provides that .5 percent of municipal tax payments

paid to the state shall be credited to the "municipal income tax administrative fund" rather than to the fund that distributes the funds to the municipalities.

{¶ 14} H.B. 49 makes the centralized-administration option available with respect to "taxable years beginning on or after January 1, 2018." *Id.* at uncodified Section 803.100(A). And the legislation requires all municipalities that impose the tax to adopt by ordinance or resolution R.C. 718.80 through 718.95 "on or before January 31, 2018." *Id.* at uncodified Section 803.100(B).

### C. Course of proceedings

{¶ 15} These appeals both originate from an action for declaratory and injunctive relief that was filed in the Franklin County Court of Common Pleas on November 16, 2017 by more than 100 municipalities. The city of Athens was the lead plaintiff, and we refer to that group of plaintiffs as the "Athens plaintiffs." A second set of municipalities, with the city of Elyria as the lead plaintiff (the "Elyria plaintiffs") intervened in the action. The complaint named four defendants but two were later dismissed, leaving defendants-appellees, the state of Ohio and the tax commissioner (then Joseph Testa, now Jeff McClain) (collectively, "the state").

{¶ 16} The trial court entered an agreed order in December 2017 staying enforcement of uncodified Section 803.100(B) of H.B. 49, thereby delaying the requirement that the plaintiffs adopt the centralized-administration provisions as municipal law. In February 2018, the trial court held a two-day preliminary-injunction hearing, and shortly thereafter, it entered a dispositive order that denied injunctive relief, rejected the complaint on the merits, and rendered judgment for the defendants.

{¶ 17} The Athens plaintiffs appealed to the Tenth District Court of Appeals, and the Elyria plaintiffs filed a separate appeal. The Tenth District

consolidated the appeals for decision, and by a two-to-one vote, it affirmed the trial court's judgment.[2]  The court subsequently denied motions for reconsideration.

{¶ 18} The Athens plaintiffs and the Elyria plaintiffs separately appealed to this court.  We accepted the appeals on the following propositions of law:

- "A State-administered, centralized system for reporting and collecting municipal net profits taxes, paid for by a tax on municipalities, violates the Home Rule Amendment of the Ohio Constitution."  (Elyria plaintiffs; case No. 2019-0693.)

- "The Home Rule Amendment grants municipal corporations a general power of municipal taxation, and where a State law engulfs municipal corporations' general power of taxation, that State law is unconstitutional." (Athens plaintiffs; case No. 2019-0696.)

{¶ 19} The city of Akron also appealed, filing a second notice of appeal in case No. 2019-0696.  The two appeals before us, case Nos. 2019-0693 and 2019-0696, were consolidated for oral argument, and we resolve them both in this decision.

## II. ANALYSIS

### A. Home rule and municipal taxation

{¶ 20} Article XVIII, Section 3 of the Ohio Constitution (the "Home Rule Amendment") provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws," and Article XVIII, Section 7 states that "[a]ny municipality may frame and adopt or amend a charter for its government and may, subject to the

---

2. In addition to the home-rule challenge, the Tenth District decision addresses a single-subject challenge to H.B. 49 along with other constitutional and procedural issues.  None of the additional challenges or issues are before us.

SUPREME COURT OF OHIO

provisions of section 3 of this article, exercise thereunder all powers of local self-government."

{¶ 21} We have consistently identified taxation as "one of the 'powers of local self-government' expressly delegated by the people of the state to the people of the municipalities," *Cincinnati Bell Tel. Co. v. Cincinnati*, 81 Ohio St.3d 599, 605, 693 N.E.2d 212 (1998), citing *State ex. rel. Zielonka v. Carrel*, 99 Ohio St. 220, 227, 124 N.E. 134 (1919); *see also New York Frozen Foods, Inc. v. Bedford Hts. Income Tax Bd. of Rev.*, 150 Ohio St.3d 386, 2016-Ohio-7582, 82 N.E.3d 1105, ¶ 29.

{¶ 22} In the area of taxation, the Ohio Constitution specifically authorizes the General Assembly to limit municipal home-rule power. Article XVIII, Section 13 confers on the General Assembly the authority to pass laws to "limit the power of municipalities to levy taxes and incur debts for local purposes." Moreover, Article XIII, Section 6 of the Constitution provides that the General Assembly has the authority to "restrict [municipalities'] power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power."

{¶ 23} In considering the home-rule provisions and the General Assembly's authority, we have held that " '[t]he Constitution authorizes the city to exercise part of the sovereign power, and in the proper exercise of that part it is immune from general laws.' " *Dies Elec. Co. v. Akron*, 62 Ohio St.2d 322, 325, 405 N.E.2d 1026 (1980), quoting *Froehlich v. Cleveland*, 99 Ohio St. 376, 391, 124 N.E. 212 (1919). Accordingly, with respect to municipal taxation, immunity from state law is the rule, with the exception being that the General Assembly may pass legislation that "limits" or "restricts" the power of municipalities to tax.

{¶ 24} During the first 85 years of home rule, this court held that if the General Assembly had enacted a tax of a particular type, the state occupied the field as to that type of tax and thereby implicitly preempted a similar municipal tax. *See*

*Cincinnati v. Am. Tel. & Tel. Co.*, 112 Ohio St. 493, 147 N.E. 806 (1925), paragraph two of the syllabus. In 1998 we overruled the doctrine of implied preemption and held that a state tax law does not preempt municipal power unless it does so expressly. *Cincinnati Bell*, 81 Ohio St.3d 599, 693 N.E.2d 212, at syllabus.

### B. The nature of the arguments

{¶ 25} Before us are two appeals. We will refer to appellants in case No. 2019-0693, which was filed and briefed by the Elyria plaintiffs, as "Elyria." With the exception of Akron, which filed a separate notice of appeal and briefs in case No. 2019-0696, we will refer to appellants in case No. 2019-0696 as "Athens." The various arguments advanced all involve questions of law, which we review de novo, *Cleveland v. State*, 157 Ohio St.3d 330, 2019-Ohio-3820, 136 N.E.3d 466, ¶ 15.

{¶ 26} Elyria concedes that the General Assembly may restrict the substantive content of tax ordinances that a city or village may enact but argues that the General Assembly does not have the power to control—and ultimately take over in part—the administration of a municipal tax that has been validly enacted. This argument focuses on the meaning of "levy" in Article XVIII, Section 13. Athens and Akron focus less on the term "levy" and more on the term "limit" in Article XVIII, Section 13; they assert that regardless of the precise scope of the term "levy," the General Assembly exceeded its power to impose limits on municipal authority in the tax area both by imposing a uniform municipal code in H.B. 5 and by imposing centralized administration in H.B. 49. Additionally, Athens challenges R.C. 718.85(B), under which the state retains .5 percent of municipal net-profits taxes it collects as unconstitutional and argues that that provision is not severable from centralized administration under H.B. 49.

### C. The General Assembly has the power to impose limitations on both the enactment and the administration of municipal taxes

{¶ 27} We first turn to Elyria's contention that the General Assembly's authority to "limit the power of municipalities to levy taxes," Article XVIII, Section

13, enables it to prevent a municipality from imposing a specific tax but does not enable it to prevent a municipality from determining taxpayer liabilities and collecting taxes in relation to a validly enacted municipal tax. This argument centers on what it means for the General Assembly to have authority to limit the municipal power "to levy taxes." Does the term "levy" in Article XVIII, Section 13 mean only a municipality's legislative enactment of a tax or, as the state asserts, does it also include the administrative acts that the enactment requires—determining liabilities and collecting taxes? If the former is true, then the General Assembly lacked authority to impose centralized administration of the net-profits tax after it permitted municipalities to impose such a tax.

{¶ 28} The state contends that even if "levy" in Article XVIII, Section 13 has the restrictive meaning attributed to it by Elyria, the state still prevails, because Article XIII, Section 6 allows the General Assembly to "restrict [the municipalities'] power of taxation" and that section does not use the term "levy." Because we conclude that the state's interpretation of "levy" in Article XVIII, Section 13 is correct, we need not consider whether Article XIII, Section 6 grants the General Assembly any additional power to limit municipal taxation.

{¶ 29} We agree with the state that "levy" bears the broader rather than the more restrictive meaning. "Generally speaking, in construing the [Ohio] Constitution, we apply the same rules of construction that we apply in construing statutes." *Toledo City School Dist. Bd. of Edn. v. State Bd. of Edn.*, 146 Ohio St.3d 356, 2016-Ohio-2806, 56 N.E.3d 950, ¶ 16. Typically, "[w]ords used in the Constitution that are not defined therein must be taken in their usual, normal, or customary meaning." *Id.*

*1. The dictionary definitions of "levy" support the broader rather than the more restrictive interpretation*

{¶ 30} In determining the "common and ordinary meaning" of words, courts may look to dictionaries. *See State ex rel. Lake Cty. Bd. of Commrs. v.*

*Zupancic*, 62 Ohio St.3d 297, 300, 581 N.E.2d 1086 (1991). In this case, the Tenth District cited two dictionary definitions from the early 20th century that support its view that the phrase "levy taxes" in Article XVIII, Section 13 encompasses administrative functions necessitated by a tax as well as the legislative enactment of the tax. 2019-Ohio-277, 119 N.E.3d 469, ¶ 44.

{¶ 31} In response, Elyria cites the current definition of the verb "levy" in *Black's Law Dictionary*: "[t]o impose or assess (a fine or a tax) by legal authority." *Black's* at 1091 (11th Ed.2019). Because the words "collect" and "administer" are absent from the definition, Elyria reasons, "levy" is limited to legislative enactment. That reasoning is faulty because the word "assess" plainly connotes administrative as well as legislative action. This is clear not only from the dictionary definition of "assess," *id.* at 144 (defining "assess" as "[t]o calculate the amount or rate of (a tax, fine, etc.)"), but also from the way the term is used in tax legislation, *see* R.C. 5739.03(B)(4) (authorizing the tax commissioner to issue a "notice of intent to levy an assessment" against a vendor). Notably, the example of the sales-tax-assessment statute just cited (R.C. 5739.03(B)(4)) connects "levy" with "assessment" and uses both terms in the context of administrative rather than legislative action. *See also* R.C. 319.30(A) (the county auditor, as assessor of real-estate taxes, "shall proceed to determine the sums to be levied upon each tract and lot of real property"). Thus, contrary to Elyria's assertion, the current definition of "levy" in *Black's* does not support Elyria's restrictive understanding of the term "levy" in Article XVIII, Section 13.

{¶ 32} Elyria then looks to the 1910 edition of *Black's*, which notes that the word "levy" is used in two different senses in reference to taxation and indicates that the "more proper[]" meaning is "to lay or impose a tax," *id.* at 714 (2d Ed.1910). The definition goes on to say, however, that the term can refer to the administrative assessment of a tax against a particular taxpayer as well as "the entire process of collecting the taxes." Elyria is reduced to arguing that the term in the

Constitution must have the meaning that the dictionary deems to be "more proper." This argument is not compelling.

{¶ 33} In support of its argument, Elyria also cites a 1914 edition of *Bouvier's Law Dictionary* for its definition of the noun phrase "tax levy." Although the phrase "tax levy" is often used to refer to the legislation by which a tax is imposed, *see* R.C. Chapter 5705, that does not limit the meaning of the term "levy" more generally—nor does the ordinary usage of "tax levy" necessarily define the scope of the differently worded phrase "power * * * to levy taxes" in Article XVIII, Section 13.[3]

{¶ 34} The dictionary definitions cited by Elyria militate strongly in favor of the conclusion that the term "levy" in the phrase "levy taxes" encompasses administrative actions such as determining the tax obligations of particular taxpayers. Moreover, the use of the term "levy" in the decisions of this court supports that conclusion. *See, e.g., Abraitis v. Testa,* 137 Ohio St.3d 285, 2013-Ohio-4725, 998 N.E.2d 1149, ¶ 4 (noting that the taxpayer advanced "specious (and often incomprehensible) arguments to oppose the tax assessments levied against him"); *Rowe-Reilly Corp. v. Tracy*, 85 Ohio St.3d 625, 627, 710 N.E.2d 694 (1999) ("The assessments levied against the appellant were for tax years 1988 through 1993"); *Dayton Press, Inc. v. Lindley*, 22 Ohio St.3d 112, 113, 489 N.E.2d 789 (1986) ("a hearing was held by the Tax Commissioner and the sales and use tax assessment levied against Dayton Press was affirmed"); *Lindner Bros., Inc. v. Kosydar*, 46 Ohio St.2d 162, 163, 346 N.E.2d 690 (1976) (court described the tax appeal as involving "a sales and use tax assessment levied against [an entity] and a sales tax assessment levied against [another entity]"); *Interstate Motor Freight Sys.*

---

3. Elyria also sets out three nonlegal-dictionary definitions of "levy" and claims that they limit the meaning of the word to "the legislative branch's determination to impose a tax or fine [and that they do not include in the meaning] the separate and distinct process by which the executive branch subsequently implements the process of realizing the tax or fine." We do not agree with Elyria's characterization of those definitions.

*v. Donahue*, 8 Ohio St.2d 19, 221 N.E.2d 711 (1966) (noting that "[a] highway use tax assessment * * * was levied against appellant by appellee, the Tax Commissioner of Ohio"); *Trotwood Trailers, Inc. v. Evatt*, 142 Ohio St. 197, 199, 51 N.E.2d 645 (1943) ("This cause is an appeal * * * from a decision of the Board of Tax Appeals affirming the finding of the Tax Commissioner confirming the sales tax assessment levied against the appellant").

*2. Uses of the term "levy" in other provisions of the Ohio Constitution do not support a restrictive interpretation of the term in Article XVIII, Section 13*

{¶ 35} Elyria points to a number of other provisions of the Ohio Constitution that employ forms of the word "levy" and contends that the passages that use that word in connection with a form of the word "collect" (e.g., the phrase "levying and collecting" is used in Article XII, Section 11) are inconsistent with a broad understanding of "levy," because interpreting "levy taxes" in Article XVIII, Section 13 to encompass administering taxes would mean that the term "collect" in those other provisions is superfluous. This argument relies on one of the basic rules of statutory construction—a court should " 'give effect to every word and clause' " and " 'avoid that construction which renders a provision meaningless or inoperative,' " *D.A.B.E., Inc. v. Toledo-Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 26, quoting *State ex rel. Myers v. Rural School Dist. of Spencer Twp. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917); *see also* R.C. 1.47(B).

{¶ 36} Reading "levy" (and other forms of the word) to encompass administration as well as enactment does not violate the above-noted rule of construction, because although giving "levy" the broader meaning creates overlap with "collect," each word continues to have an additional meaning that the other word does not have. Specifically, "levy" includes a legislative enactment that creates tax obligations and "collect" does not; "collect" includes the actual receipt of money payments, whereas "levy" focuses on the creation—legislative or

administrative—of the legal obligation to make such payments in the first place. Because mere overlap in meaning does not violate the above-noted rule of construction, "levy taxes" may properly be understood to encompass tax administration in various constitutional provisions. *See In re BankVest Capital Corp.*, 360 F.3d 291, 301 (1st Cir.2004) (the presence of "substantial overlap among the provisions of" the statute at issue was "not the same as surplusage").

### 3. Elyria's corpus-linguistics analysis is unpersuasive

{¶ 37} Elyria urges us to employ corpus linguistics to discern the meaning of "levy." "Corpus linguistics allows lawyers to use a searchable database to find specific examples of how a word was used at any given time." *Wilson v. Safelite Group, Inc.*, 930 F.3d 429, 440 (2019) (Thapar, J., concurring in part and concurring in judgment). According to Judge Thapar, "[i]ts foremost value may come in those difficult cases where statutes split and dictionaries diverge." *Id.* Consistently with this last point, an opinion cited by Judge Thapar in *Wilson* predicates the use of corpus linguistics on the need to (1) "openly acknowledge the ambiguity" when "confronted with a contest between two competing constructions that each find tenable support in our lexicon" and (2) "check [the judge's] intuition against publicly available means for assessing the ordinary meaning of a statutory phrase," *State v. Rasabout*, 2015 UT 72, 356 P.3d 1258, ¶ 55-56 (Lee, A.C.J., concurring in part and concurring in judgment).

{¶ 38} Recourse to corpus linguistics is unnecessary in this case because we do not confront the type of lexical ambiguity that requires additional means of establishing the ordinary meaning of a word. Every source we have consulted indicates that the term "levy" may encompass administrative as well as legislative acts. As a result, this is not a case in which the dictionary " 'fails to dictate the meaning that the statutory terms "must bear" in this context.' " *Id.* at ¶ 47 (Durrant, C.J., concurring in part and concurring in judgment), quoting *State v. Canton*, 2013 UT 44, 308 P.3d 517, ¶ 14.

{¶ 39} Elyria's corpus-linguistics analysis is unpersuasive. Elyria's search of a corpus of United States Supreme Court opinions collected by English-Corpora.org and available online yielded 277 instances of the court's using the phrase "to levy and collect" in reference to taxes. These data, says Elyria, "reinforce[] the notion that merely saying 'to levy' in reference to a tax does not include 'collection' of that tax." Although that may be true, that does not mean that the phrase "levy taxes" does not include the administration of the tax, as we have already discussed.

{¶ 40} Next, Elyria argues that the result of the search for the phrase "to levy" in the corpus of contemporary American English collected by English-Corpora.org "suggests that when writers use the infinitive phrase 'to levy' (without including 'and collect'), they are referring to the exercise of the power to impose a financial condition, such as a tax, fine, special assessment, or the like" and so the data "do[] not suggest that 'to levy' further implies the machinery by which the financial assessment is collected by the governing authority so empowered." Here again, "levy" in the sense of imposing a financial obligation is an administrative act when it involves determining the specific liability of a taxpayer under a general tax law. Elyria does not explain how the data from this corpus "suggest[]" the conclusion Elyria reaches, and we decline to attach any significance to the data.

{¶ 41} Finally, Elyria states that a search of English-Corpora.org's corpus of historical American English for how the phrase "to levy" was used during the time immediately preceding adoption of the 1912 Ohio Constitution resulted in 21 instances of the use of the phrase. Over two-thirds of the references to "levy" were clearly used in relation to a tax, fine, duty, or contribution. In none of those instances, says Elyria, did the term appear to involve an administrative action relating to the collection of the obligation imposed. But in our view, the data are more ambiguous than that—we see at least a few instances in the search result provided in Elyria's brief in which "levy" may (depending on context, which is not

available in the chart provided in Elyria's brief) refer to administrative as well as legislative acts. Thus, the data do not support Elyria's conclusion.

*4. There is no canon of construction calling for a restrictive interpretation of "levy" in the phrase "levy taxes"*

{¶ 42} Elyria argues that "Article XVIII, Section 13 is subject to the principle that 'statutes granting privileges or relinquishing rights are to be strictly construed,' " quoting *Caldwell v. United States*, 250 U.S. 14, 20, 39 S.Ct. 397, 63 L.Ed. 816 (1919). In *Caldwell*, the United States Supreme Court restrictively construed a license granted by Congress to a private party, which is not analogous to the issue we confront here. Nor does *Piqua Bank v. Knoup*, 6 Ohio St. 342 (1856), provide any support for Elyria's position: Elyria cites the dissenting opinion, which is not law.

*5. The restrictive construction of "incur debt" in Article XVIII, Section 13, does not imply a restrictive meaning of "levy taxes"*

{¶ 43} Athens argues that certain decisions from this court call for a restrictive view of the General Assembly's power to limit the power of municipalities to levy taxes. The main cases it relies on are *State ex rel. Cronin v. Wald*, 26 Ohio St.2d 22, 268 N.E.2d 581 (1971), and *Dies*, 62 Ohio St.2d 322, 405 N.E.2d 1026. Those cases are inapposite here because both apply a limiting construction to Article XVIII, Section 13's grant of power to the General Assembly to limit municipalities' power to incur debt and neither addresses the scope of the General Assembly's power under that section to limit municipalities' power to levy taxes.

{¶ 44} Any obligation of funds in the ordinary course of municipal business constitutes "incurring debt" in the broader sense, with the result that the General Assembly's power to limit the incurring of debt, if extended to its fullest connotation, would allow the state to control daily operations of municipalities. As this clearly would be inconsistent with the purpose of the Home Rule Amendment,

16

*Cronin* and *Dies* held that that the General Assembly's power under the Constitution with respect to incurrence of debt is not expansive, but extends only to such acts as "limit[ing] a municipality's aggregate indebtedness," *Cronin* at 27, or restricting " 'the extent of bonded indebtedness for local purposes,' " *Dies* at 328, quoting *State ex rel. Toledo v. Weiler*, 101 Ohio St. 123, 130, 128 N.E. 88 (1920). By contrast, limiting a municipality's power to tax does not lead to the same kind of potential for comprehensive state control of municipal operations.

### D. Prescribing a municipal income-tax code and imposing centralized administration constitute valid acts of limitation

{¶ 45} Having concluded that the General Assembly's power to limit the levy of municipal taxes includes the power to limit administration of a validly enacted tax, we turn to the contention that the power to limit does not include the power to impose centralized administration. Akron asserts that Article XVIII, Section 13 has never been interpreted "as granting the authority to the State to take over the operations of [municipal] government or exercise total control over all aspects of municipal taxation." Athens contends that the power to limit or restrict local taxation "do[es] not authorize the State to commandeer the municipal taxing authority for itself" and that the state's power to "limit" does not allow it to achieve indirectly what the Constitution does not directly authorize it to do.

{¶ 46} In approaching this issue, we consider whether establishing centralized administration of municipal taxes can be understood as a constitutionally proper act of limitation by the General Assembly. In *Gesler v. Worthington Income Tax Bd. of Appeals*, 138 Ohio St.3d 76, 2013-Ohio-4986, 3 N.E.3d 1177, the Geslers sought city-income-tax refunds under a tax ordinance that explicitly exempted income from Schedule C. During the period relevant in that case, R.C. 718.01 prohibited a city that imposed an income tax from exempting that income. *See id.* at ¶ 15-16. We held that the Geslers were entitled to refunds inasmuch as "Worthington chose not to tax Schedule C income, and the General

Assembly cannot limit or restrict a power of taxation that Worthington did not exercise." *Id*. at ¶ 22. Further, we stated that "the General Assembly cannot command Worthington to impose a tax on Schedule C income when Worthington has chosen not to tax that income, because such a requirement is not an act of limitation." *Id.*

**{¶ 47}** After *Gesler* was decided, the General Assembly passed H.B. 5, which invoked the General Assembly's authority to broadly preempt municipal income taxes based on the fact that the state has imposed its own income tax, R.C. Chapter 5747. *See* R.C. 715.013(A) ("Except as otherwise expressly authorized by the Revised Code, no municipal corporation shall levy a tax that is the same as or similar to a tax levied under Chapter * * * 5747 * * * of the Revised Code"). The provisions enacted under H.B. 5 permit municipalities to tax income on the conditions that the municipality do so in accordance with the provisions of R.C. Chapter 718 and that it explicitly incorporate those provisions into its tax code. R.C. 715.013(B) and 718.04(A).

**{¶ 48}** Athens predicates its challenge to centralized administration under H.B. 49 in part on a broader challenge to H.B. 5. Just as H.B. 5 mandates a uniform municipal-income-tax code by conditioning the power to impose the tax on the municipality's incorporating the state-prescribed code into its local tax ordinance, H.B. 49 imposes centralized administration by conditioning the municipal power to impose the tax on the municipality's incorporating R.C. 718.80 through 718.95 into its local tax ordinance, H.B. 49 at uncodified Section 803.100(B). Athens maintains that both of these acts exceed the state's power to impose limits and that this court's caselaw, including *Gesler,* "leads to the conclusion that the limiting power of the State does not include the power broadly to define what local tax laws must look like."

**{¶ 49}** We disagree. The enactment of H.B. 5 and H.B. 49 converted the affirmative requirements of R.C. Chapter 718 into adjuncts of the broader

preemption of municipal income taxes. After H.B. 5, a municipality that is able to enforce its ordinance at all has incorporated the prescribed provisions of state law. And once R.C. Chapter 718 has been explicitly incorporated into a municipality's tax code, any other provision of the municipality's ordinance at odds with it would be an internal conflict within municipal law. Had the provisions of H.B. 5 and H.B. 49 been in effect during the relevant period in *Gesler*, 138 Ohio St.3d 76, 2013-Ohio-4986, 3 N.E.3d 1177, the outcome of that case would likely have been different.

{¶ 50} It is clear that we cannot question the General Assembly's authority to impose a uniform municipal income-tax code through H.B. 5, and by extension to impose centralized administration of the tax under H.B. 49, without calling into question the preemptive authority on which it is logically based. As we have previously discussed, that preemptive authority is plenary, at least in areas in which the state itself is imposing regulations, taxes, or fees. *See Panther II Transp., Inc. v. Seville Bd. of Income Tax Rev.*, 138 Ohio St.3d 495, 2014-Ohio-1011, 8 N.E.3d 904, ¶ 23 (taxpayer established its exemption from municipal income tax by "showing that it was regulated as a motor-transportation company and that former R.C. 4921.25 preempted local taxes as applied to such entities"). Throughout the history of municipal home rule in this state, it has been well understood that the state has broad preemptive power in the municipal-tax area. *See Cincinnati v. Roettinger*, 105 Ohio St. 145, 156, 137 N.E. 6 (1922) (Article XVIII, Section 13 "reiterated some of the provisions which were already generally stated" in another article of the Constitution "for the purpose of special emphasis and in order that there might be no mistake as to the power of the Legislature over the matter of taxation by municipalities notwithstanding the liberal concessions made to municipalities in other sections of article XVIII"); *Angell*, 153 Ohio St. 179, 91 N.E.2d 250, at paragraph one of the syllabus ("Ohio municipalities have the power to levy and collect income taxes * * * subject to the power of the General Assembly

to limit the power of municipalities to levy taxes under Section 13 of Article XVIII or Section 6 of Article XIII of the Ohio Constitution"). Although we have more recently held that a state law preempts municipal power only when it does so explicitly, *Cincinnati Bell*, 81 Ohio St.3d 599, 693 N.E.2d 212, at syllabus, we did not question the General Assembly's "constitutional prerogative" to exercise that preemptive authority, *id.* at 606.

{¶ 51} We hold that the General Assembly's authority to limit the power of municipalities to tax allows it to broadly preempt municipal income taxes and to require that such taxes be imposed in strict accordance with the terms dictated by legislation passed by the General Assembly. Specifically, we agree with the Tenth District's determination that "[b]ecause Article XVIII, Section 13 permits the General Assembly to limit the municipalities' power to levy taxes, the General Assembly can require municipalities to enact legislation that accomplishes this aim." 2019-Ohio-277, 119 N.E.3d 469, at ¶ 51.

{¶ 52} Akron maintains that Article XVIII, Section 13 has never been interpreted to grant to the state "authority to take over the internal operations of local self-government."[4] The laws enacted by H.B. 49 do not take over a municipality's own internal operations; instead, they make administration of municipal net-profits tax, for those taxpayers who elect centralized administration,

---

4. On a more limited scale, the state mandated centralized administration 20 years ago in relation to municipal net-profits taxes of electric companies. The General Assembly enacted a centralized administration-and-collection regime similar to the one at issue in this case. Sub.H.B. No. 483, 148 Ohio Laws, Part III, 5155 ("H.B. 483") (title of the act states that the act's purpose is "to prescribe a uniform set of procedures and remedies regarding municipal taxation of electric light company income [and] to provide for the collection of municipal taxes on those companies by the state"); *see also* R.C. Chapter 5745. The General Assembly later added the taxation of telephone companies to this regime. Am.Sub.H.B. No. 95, 150 Ohio Laws, Part I, 396, and Part II, 2119. Also, as it did in H.B. 49, in H.B. 483, the General Assembly directed a percentage of the tax proceeds to the "municipal income tax administrative fund" in the state treasury—the same fund used under H.B. 49 for the .5 percent of net-profits taxes retained, *id.* at 5170-5171; *see also* R.C. 5745.03(A), but because the municipalities did not contest that provision, the courts have not ruled on its constitutionality.

an operation of the state tax department. The state law acknowledges that the state thereby becomes a fiduciary for the municipalities whose taxes it collects. *See* R.C. 718.84(F)(4). We conclude that the General Assembly acted within its authority when it enacted centralized administration of municipal net-income taxes in H.B. 49.

### E. The General Assembly's appropriation of .5 percent of the municipal net-tax proceeds is not a valid act of limitation

{¶ 53} According to Athens, R.C. 718.85(B) retains "a mandatory one-half percent of all net profits taxes filed with the State * * * as a fee for administering the net profits tax system," (emphasis deleted), and it argues that the "[m]unicipalities' plenary power of taxation must include the right to keep the tax revenues they raise," or else "the power of taxation is illusory."[5] In defending the retention, the state calls it neither a fee nor a tax, stating that R.C. 718.85(B) requires "municipalities to bear the [administrative] costs of the taxes they impose—costs that would previously have been borne by the municipalities directly, but that are now borne by the State in the first instance."

{¶ 54} We conclude that whether the .5 percent retention is viewed as a fee or as a tax, the General Assembly had no authority to impose it. We first consider whether R.C. 718.85(B) can be upheld as a fee. " 'The classic "regulatory fee" is imposed by an agency upon those subject to its regulation.' " *Drees Co. v. Hamilton Twp.*, 132 Ohio St.3d 186, 2012-Ohio-2370, 970 N.E.2d 916, ¶ 28,

---

5. Athens also challenges R.C. 718.80(C)(3), which provides that if a municipality fails to comply with its duty to supply the state with tax-rate information and other specified taxpayer information, the state budget director may withhold 50 percent of payments otherwise due to a municipality until it does comply. Athens asserts that the General Assembly lacks authority "for the State to seize and retain municipal revenues or funds." In response, the state points out that the plain text of R.C. 718.80(C)(3) does not permit the state to retain the funds after the municipality complies with the law and, thus, the provision does not allow the state to "seize and retain municipal revenues"; instead, it functions as an incentive for municipalities to timely comply with notification requirements. We find the state's argument to be persuasive.

quoting *San Juan Cellular Tel. Co. v. Pub. Serv. Comm. of Puerto Rico*, 967 F.2d 683, 685 (1st Cir.1992).

{¶ 55} Unlike regulated private actors, however, municipalities exercise constitutionally conferred "powers of local self-government," Article XVIII, Section 3, when they impose net-profits taxes. Accordingly, when municipalities properly exercise their home-rule powers, they are " 'immune from general laws.' " *Dies*, 62 Ohio St.2d at 325, 405 N.E.2d 1026, quoting *Froehlich*, 99 Ohio St. at 391, 124 N.E. 212. For this reason, municipalities exercising home-rule authority do not qualify as persons "subject to" the state's "regulation" and the General Assembly's general power to legislate under Article II, Section 1 of the Ohio Constitution does not support the imposition of a fee.

{¶ 56} It follows that the power to impose a regulatory fee, if it exists, must emanate from a specific constitutional grant—and Article XVIII, Section 13 and Article XIII, Section 6 are the only viable candidates. Prescribing the substantive and procedural contours of the municipal income tax, as the General Assembly did in H.B. 5, is a legitimate exercise of its power to determine whether a particular kind of tax may be imposed at all. By contrast, allowing the state to retain a portion of the tax proceeds to defray its expenses cannot be seen as a legitimate exercise of the General Assembly's power to limit or restrict municipal taxation.[6] We therefore hold that imposing a regulatory fee measured by a percentage of municipal-tax proceeds is not an authorized act of limitation under Article XVIII, Section 13 or a valid restriction under Article XIII, Section 6.

---

6. Amici Ohio Society of Certified Public Accountants et al. argue that state law directs a portion of certain enumerated taxes (e.g., school-district income tax, R.C. 5747.03) to the state tax department to defray administrative expenses. But those taxes are different from the taxes at issue here because, although they involve locally voted levies, they are ultimately imposed under the enabling authority of state law—not, as in this case, pursuant to an exercise of home-rule authority.

{¶ 57} If viewed as a tax, the .5 percent retention fares no better. Quite simply, Article XVIII, Section 13 and Article XIII, Section 6 confer the power to limit or restrict municipal actions, not the power to tax municipal revenues.

{¶ 58} There is one final question for our resolution: Can the portion of R.C. 718.85 providing for .5 percent retention of municipal taxes be severed so as to save the provisions of H.B. 49 that have not been found to offend the Constitution? *State ex rel. Sunset Estate Properties, L.L.C. v. Lodi*, 142 Ohio St.3d 351, 2015-Ohio-790, 30 N.E.3d 934, ¶ 16. For severance to be appropriate, the provision to be severed must satisfy a three-pronged test: (1) the provision must be capable of separation so that the constitutional portion of the statutory scheme may stand by itself, (2) the provision must not be so connected with the general scope of the statutory scheme that the apparent intent of the legislature cannot be given effect if the provision is stricken, and (3) it should not be necessary to insert words or terms in order to separate the constitutional from the unconstitutional portions of the statutory scheme. *Cleveland v. State*, 138 Ohio St.3d 232, 2014-Ohio-86, 5 N.E.3d 644, ¶ 19; *see also Simmons-Harris v. Goff,* 86 Ohio St.3d 1, 8, 711 N.E.2d 203 (1999).

{¶ 59} The retention provision easily satisfies the severance criteria. Regarding the first prong, the centralized-administration scheme can clearly stand on its own, as long as the state finds an alternative way to finance it. Regarding the second prong—once again, as long as the state finds other revenue—the intent of the legislature to provide a more convenient compliance method for municipal net-profits taxpayers can be fully effectuated without the .5 percent retention. Moreover, the state itself takes the position that if the .5 percent retention is held unconstitutional, that "would not justify invalidating H.B. 5 and H.B. 49 in their entirety." Finally, the only linguistic operation necessary to effectuate the severance is to subtract words from R.C. 718.85(B), namely, those words specifying diversion of .5 percent to the municipal-income-tax administrative fund.

After subtracting the constitutionally offensive words, R.C. 718.85(B) states: "The tax commissioner shall immediately forward to the treasurer of state all amounts the commissioner receives pursuant to sections 718.80 to 718.95 of the Revised Code. The treasurer shall credit such amounts to the municipal net profit tax fund which is hereby created in the state treasury."

{¶ 60} Accordingly, we hold that the .5-percent-retention provision is unconstitutional, and we sever it.

### III. CONCLUSION

{¶ 61} For the foregoing reasons, we affirm in part and reverse in part the judgment of the court of appeals. We affirm the portion of the court of appeals' judgment upholding the centralized-administration system imposed by H.B. 49, but we reverse the portion of the judgment upholding the .5 percent retention of municipal net-profits taxes by the state. We also remand the cause to the trial court and instruct it to enter judgment in accordance with this decision and to take whatever further action may be appropriate to effectuate that judgment.

Judgment affirmed in part
and reversed in part,
and cause remanded.

O'CONNOR, C.J., and FISCHER and STEWART, JJ., concur.

KENNEDY, J., concurs in part and dissents in part, with an opinion.

DEWINE, J., concurs in part and dissents in part, with an opinion joined by FRENCH, J.

_____

**KENNEDY, J., concurring in judgment only in part and dissenting in part.**

{¶ 62} Because the General Assembly's power to *limit* tax levies does not permit it to enact legislation that *abolishes* municipal income taxation and *compels* a municipality to adopt a uniform statutory scheme for imposing and administering

a municipal income tax, I dissent from the portion of the majority's judgment affirming the court of appeals. The people of Ohio adopted the Home Rule Amendment, Article XVIII of the Ohio Constitution, to remove statutory control over cities and villages by the General Assembly, granting to municipalities power over local self-government, including the power of taxation. *See Cincinnati Bell Tel. Co. v. Cincinnati*, 81 Ohio St.3d 599, 605, 693 N.E.2d 212 (1998). However, the majority's holding permits the General Assembly to eliminate the municipal power of taxation altogether and to compel the cities and villages of Ohio to cede their sovereignty over matters of local self-government to the state in exchange for revenue essential to their survival. That holding cannot be squared with the plain language of the Home Rule Amendment. Accordingly, I would reverse the judgment of the Tenth District Court of Appeals.

{¶ 63} Prior to 1912, "the source and extent of municipal power was derived from the enactments of the General Assembly." *Cincinnati Bell Tel. Co.* at 605. "[M]unicipalities could exercise only those powers delegated by statute." *Geauga Cty. Bd. of Commrs. v. Munn Rd. Sand & Gravel*, 67 Ohio St.3d 579, 582, 621 N.E.2d 696 (1993). "Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature, * * * and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal conditions." *Perrysburg v. Ridgway*, 108 Ohio St. 245, 255, 140 N.E. 595 (1923).

{¶ 64} To remedy this problem, the people of this state in 1912 adopted the Home Rule Amendment, which provides that "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Article XVIII, Section 3, Ohio Constitution.

{¶ 65} "Passage of the Home Rule Amendment provided municipalities with 'full and complete political power in all matters of local self government.' "

*Cincinnati Bell Tel. Co.,* 81 Ohio St.3d at 605, 693 N.E.2d 212, quoting *Perrysburg* at 255; *see* Article XVIII, Section 3, Ohio Constitution (granting municipalities authority to "exercise all powers of local self-government"). This court has long recognized that the power of local governments to levy taxes is included within this broad grant of authority, *Put-in-Bay v. Mathys*, ___ Ohio St.3d ___, 2020-Ohio-4421, ___ N.E.3d ___, ¶ 12, citing *State ex rel. Zielonka v. Carrel*, 99 Ohio St. 220, 227, 124 N.E. 134 (1919).

{¶ 66} But although the Ohio Constitution grants broad powers of local self-government to municipalities, the scope of those powers is not without limits. *Buckeye Community Hope Found. v. Cuyahoga Falls*, 82 Ohio St.3d 539, 541, 697 N.E.2d 181 (1998). Home-rule authority granted under Article XVIII, Section 3 is subject to other provisions of the Constitution. *Id.*; *State ex rel. Semik v. Cuyahoga Cty. Bd. of Elections*, 67 Ohio St.3d 334, 336, 617 N.E.2d 1120 (1993).

{¶ 67} The Ohio Constitution places a check on municipal authority to levy taxes. Article XIII, Section 6 of the Ohio Constitution, which was adopted as part of the 1851 Constitution, directs the General Assembly to "provide for the organization of cities, and incorporated villages, by general laws; and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power." Article XVIII, Section 13, which was adopted as part of the Home Rule Amendment in the 1912 Constitution, enables the General Assembly to pass laws "to limit the power of municipalities to levy taxes and incur debts for local purposes."

{¶ 68} This court has recognized that "the intention of the Home Rule Amendment was to eliminate statutory control over municipalities by the General Assembly," *Cincinnati Bell Tel. Co.* at 605, and we have explained that "the Constitution requires that the provisions allowing the General Assembly to limit municipal taxing power be interpreted in a manner consistent with the purpose of home rule," *id.*

26

{¶ 69} We have therefore held that the General Assembly's power to limit municipal taxation and indebtedness "does not authorize the Legislature to annul or curtail the powers expressly granted by the Constitution." *State ex rel. Toledo v. Weiler*, 101 Ohio St. 123, 129-130, 128 N.E. 88 (1920). "It may limit the levies of taxes and the extent of bonded indebtedness for local purposes, but it may not, either by action or inaction, preclude the exercise of power expressly conferred by the Constitution, or deny the use of its revenues from taxation or its general credit for any purpose authorized by constitutional provision or for any purpose within the powers of local self-government thereby conferred." *Id.* at 130.

{¶ 70} We cited *Weiler* with approval in *Dies Elec. Co. v. Akron*, in which we held that neither Article XIII, Section 6 nor Article XVIII, Section 13 authorizes the state to dictate the retainage provisions for a contract for improvements to municipal property. 62 Ohio St.2d 322, 327-328, 405 N.E.2d 1026 (1980). Considering the General Assembly's authority to limit a municipality's aggregate indebtedness, we explained that the General Assembly "may not prescribe the procedure which a charter municipality must follow in limiting its expenditures arising from contracts entered into under its Home Rule powers, so long as such expenditures do not exceed the aggregate amount of indebtedness authorized by state law." *Id*. at 328. That is, we treated Article XVIII, Section 13 as allowing the General Assembly to limit *the extent* of municipal indebtedness. We did not suggest that laws could be passed to prohibit municipalities from taking on any debt.

{¶ 71} This court's statements indicating that the General Assembly's authority to "limit" or "restrict" municipal power to levy taxes does not encompass the authority to annul, curtail, deny, or preclude the exercise of that power are consistent with the plain meanings of the words "limit" and "restrict." In giving undefined words in the Constitution their usual, normal, or customary meaning, we rely on their dictionary definitions. *E.g., State v. Carswell*, 114 Ohio St.3d 210,

2007-Ohio-3723, 871 N.E.2d 547, ¶ 11-12; *State ex rel. King v. Summit Cty. Council*, 99 Ohio St.3d 172, 2003-Ohio-3050, 789 N.E.2d 1108, ¶ 35-36; *State ex rel. Lake Cty. Bd. of Commrs. v. Zupancic*, 62 Ohio St.3d 297, 300-301, 581 N.E.2d 1086 (1991); *State ex rel. Saxbe v. Brand*, 176 Ohio St. 44, 46-47, 197 N.E.2d 328 (1964).

{¶ 72} The 1911 edition of *Webster's New International Dictionary* defines the verb "limit" to mean "[t]o assign to or within certain limits" and "[t]o apply a limit to, or set a limit or bounds for." *Id.* at 1252. It also defines the noun "limit" to mean "[t]hat which terminates, circumscribes, restrains, or confines; the bound, border, or edge; the utmost extent." *Id.* The word "restrict" is synonymous; it means "[t]o restrain with bounds; to limit; to confine." *Id*. at 1819. These meanings persist today. *See Webster's Third New International Dictionary* 1312, 1937 (2002) (defining "limit" and "restrict").

{¶ 73} To limit or restrict is to set *the extent* of the bounds or authority beyond which something may not go. *See Weiler*, 101 Ohio St. 123, 128 N.E. 88, at paragraph two of the syllabus (home-rule power of local self-government is subject to "the limitation prescribed by the Legislature as to the extent of general tax levies"); *State ex rel. Bryant v. Akron Metro. Park Dist. for Summit Cty*., 120 Ohio St. 464, 482-483, 166 N.E. 407 (1929) ("It is therefore the province of the General Assembly to determine the general governmental policy and the maximum of the extent of the imposition and collection of taxes for all purposes in the state"). These words—"limit" and "restrict"—are not synonymous with the words "abolish" or "eliminate."

{¶ 74} Therefore, Article XIII, Section 6 and Article XVIII, Section 13 allow the General Assembly to restrain or confine the municipal power of taxation, but it may not abolish or eliminate—or annul, curtail, deny, or preclude—that power altogether.

{¶ 75} However, R.C. 715.013(A) precludes municipalities from imposing a wide range of taxes (except when otherwise expressly authorized by statute), including income tax (R.C. Chapter 5747), sales tax (R.C. Chapter 5739), use tax (R.C. Chapter 5741), and gross-receipts tax (R.C. Chapter 5751), among many others. Relevant here, the General Assembly enacted 2014 Sub.H.B. No. 5 ("H.B. 5") to preempt municipal income-taxation ordinances enacted under home-rule authority. R.C. 715.013 and 718.04(A) deny municipalities the power to enact their own income-tax provisions and instead permit the collection of an income tax only if municipalities adopt the statutory scheme set forth in R.C. Chapter 718 for levying taxes. The General Assembly went further in 2017 Am.Sub.H.B. No. 49 ("H.B. 49") and created additional administrative provisions for municipal income taxes, commandeering the collection of taxes owed by municipal net-profits taxpayers and charging cities a fee for doing it. R.C. 718.85(B).

{¶ 76} The majority determines that "the General Assembly's authority to limit the power of municipalities to tax allows it to broadly preempt municipal income taxes and to require that such taxes be imposed in strict accordance with the terms dictated by legislation passed by the General Assembly." Majority opinion at ¶ 51. But neither Article XIII, Section 6 nor Article XVIII, Section 13 permits the General Assembly to abolish or eliminate municipal income taxation altogether. Taken to its logical conclusion, the majority's reasoning permits the General Assembly to abolish all forms of municipal taxation and condition the collection of any revenue on the adoption of a wholly statutory taxation scheme— or even a wholly statutory form of government that surrenders all home-rule authority to the state.

{¶ 77} The power to tax is undoubtedly included in the "general, broad grant of power that municipalities enjoy under Article XVIII," *Cincinnati Bell Tel. Co.,* 81 Ohio St.3d at 605, 693 N.E.2d 212, "for without this power local government in cities could not exist for a day," *Zielonka*, 99 Ohio St. at 227, 124

N.E. 134. "It is a known fact that the necessary expense incident to the maintenance of the government of a modern city transcends all other forms of governmental expense." *Id*. "[E]xperience teaches us that the exercise of this power is the highest and most necessary attribute of government. Without it government must cease to exist * **." *Id*. at 222.

{¶ 78} Because tax revenue is essential to the exercise of home-rule authority, any statute that conditions the ability to levy taxes on enacting whatever ordinance the General Assembly demands is in conflict with the Home Rule Amendment's grant of power to municipalities to control matters of local self-government.

{¶ 79} The United States Supreme Court's decisions discussing Congress's attempts to commandeer state governments by coercing state action through the federal spending power provide a helpful analogy. The Supreme Court has struck down federal laws seeking to commandeer a state's legislative or administrative authority for federal purposes. For example, the court in *Printz v. United States* invalidated a federal statute that compelled state law-enforcement officers to perform background checks on purchasers of firearms. 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In *New York v. United States*, the court held that a federal statute compelling states either to take title to nuclear waste—in effect, compelling the state to subsidize nuclear-waste disposal—or enact a specified regulatory scheme was unconstitutional. 505 U.S. 144, 176, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The court noted that the federal and state governments are separate sovereigns and that Congress is not empowered to regulate the states. *Id*. at 166.

{¶ 80} Similarly, "while Congress may use its spending powers to encourage the states to act, it may not coerce the states into action. If the Congressional action amounts to coercion rather than encouragement, then that action is not a proper exercise of the spending powers but is instead a violation of

the Tenth Amendment." *West Virginia v. United States Dept. of Health & Human Servs.*, 289 F.3d 281, 286-287 (4th Cir.2002).

{¶ 81} For example, five justices on the United States Supreme Court concluded that by conditioning the continued receipt of all federal Medicaid dollars on a state's expansion of Medicaid benefits under the Patient Protection and Affordable Care Act, Congress exceeded the spending power by coercing states into adopting federal prerogatives. *See Natl. Fedn. of Indep. Business v. Sebelius*, 567 U.S. 519, 585, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012) (plurality opinion) (explaining that Congress had crossed the line between persuasion and coercion by conscripting states into the federal bureaucracy); *id.* at 681 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting) ("In structuring the [Affordable Care Act], Congress unambiguously signaled its belief that every State would have no real choice but to go along with the Medicaid Expansion. If the anticoercion rule does not apply in this case, then there is no such rule").

{¶ 82} In contrast is *South Dakota v. Dole*, in which the court held that the line between persuasion and coercion had not been crossed when Congress had directed "that a State desiring to establish a minimum drinking age lower than 21 lose a relatively small percentage of certain federal highway funds." 483 U.S. 203, 211, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987). The threat of losing 5 percent of federal highway funds amounted to only "relatively mild encouragement to the States to enact higher minimum drinking ages than they would otherwise choose." *Id*.

{¶ 83} These lines of analysis are instructive here. The General Assembly's power to limit and restrict municipal tax levies does not authorize it to compel a municipality to enact a statutory scheme of taxation. As this court explained in *Gesler v. Worthington Income Tax Bd. of Appeals*, "the General Assembly cannot command [a municipality] to impose a tax on Schedule C income when [the municipality] has chosen not to tax that income, because such a requirement is not

an act of limitation." 138 Ohio St.3d 76, 2013-Ohio-4986, 3 N.E.3d 1177, ¶ 22. Likewise, the General Assembly cannot command a municipality to enact the broad scheme of municipal income taxation set forth in R.C. Chapter 718.

{¶ 84} The General Assembly cannot do indirectly what it cannot do directly. The coercion in H.B. 5 and H.B. 49 is tantamount to an unconstitutional command in violation of municipal sovereignty. This legislation deprives municipalities of the power to impose and collect income-tax revenue unless they enact ordinances in compliance with statutory provisions. Instead of limiting municipal taxing authority, H.B. 5 and H.B. 49 abolish it and compel municipalities to adopt a specific system of imposing and administering an income tax by holding municipal revenue hostage. However, the Ohio Constitution has not granted the General Assembly the power to coerce or compel municipalities in this state to enact legislation in areas of local self-government. Nor does the Constitution authorize the legislature to abolish municipal taxation altogether or to commandeer the collection, administration, and enforcement of the municipalities' own tax systems.

{¶ 85} The majority's decision today is inconsistent with the language of the Constitution adopted by the people in 1912. The people of this state acted to end the General Assembly's unfettered control over municipal self-government, subject to the legislature's authority to limit the power to levy taxes as an exception to the general grant of home-rule authority. This reflects a "balanced delegation of power, by the people, to municipalities and the General Assembly with respect to municipal taxing power." *Cincinnati Bell Tel. Co.*, 81 Ohio St.3d at 606, 693 N.E.2d 212. This court should not upset that careful balance by interpreting "the specific limiting power of the General Assembly" to "engulf the general power of taxation delegated to municipalities." *Id*. at 606-607. That is, the exception should not swallow the rule.

{¶ 86} In sum, H.B. 5 and H.B. 49 do not limit or a restrict the municipal taxing power; rather, in derogation of the Home Rule Amendment, this legislation abolishes municipal authority to impose and collect an income tax and compels cities and villages in Ohio to adopt a statutory scheme of tax administration. Because these provisions exceed the authority granted to the General Assembly by the Ohio Constitution, I would reverse the judgment of the court of appeals in full. The majority does not. I therefore dissent from the portion of the majority's judgment affirming the court of appeals' judgment upholding the abolishment of municipal income taxation.

_____

**DEWINE, J., concurring in part and dissenting in part.**

{¶ 87} The majority correctly determines that it is within the legislature's constitutional authority to provide for the centralized administration of the net-profits tax. But then, somehow, it finds that the state violates the Ohio Constitution when it collects a small administrative fee to defray some of the cost of the service it provides. Nothing in our Constitution supports the majority's holding on the fee issue, so I dissent from that part of its judgment.

{¶ 88} One would think that the authority to impose a fee to defray the administrative costs goes hand in hand with the legislature's power to provide for centralized administration of the net-profits tax. But the majority tweezes the fee from the rest of the scheme, and because it can identify no provision in the Ohio Constitution explicitly authorizing such a fee, decrees it unconstitutional.

{¶ 89} This mode of analysis might make sense if we were adjudicating a claim about the enumerated powers of the federal government under the United States Constitution. But that is not what is before us. This is a question about the authority of state government. As this court has explained,

while the federal Constitution is a delegation of powers, the state Constitution is a limitation of powers. In other words, an act of Congress is not valid unless the federal Constitution authorizes it. On the other hand, the General Assembly of Ohio may enact any law which is not prohibited by the Constitution.

*Angell v. Toledo*, 153 Ohio St. 179, 181, 91 N.E.2d 250 (1950).

{¶ 90} Thus, the question the majority should be asking is not whether the fee is authorized by the Ohio Constitution but whether it is prohibited. And the answer to that question is simple: it is not. The majority is unable to point to any provision of the Ohio Constitution that forbids the implementation of such a fee. Indeed, all it can say is that the fee is not authorized by either Article XVIII, Section 13 or Article XIII, Section 6. But, of course, that's an answer to the wrong question.

{¶ 91} Though its rationale is difficult to follow, the majority appears to justify its result, at least in part, through the Ohio Constitution's Home Rule Amendment (Article XVIII, Section 3). The argument seems to be that (1) the authority of a municipality "to exercise all powers of local self-government" under the Home Rule Amendment includes the power to levy and collect municipal taxes and (2) the Ohio Constitution allows the state legislature to limit this municipal taxing authority, (3) but the fee does not act as a limit on the municipality's taxing authority, so (4) the state cannot impose a fee for the service it provides.

{¶ 92} But this argument largely misses the point. Again, the question is not whether the fee is an act of limitation but whether it is explicitly prohibited by the Ohio Constitution. *Angell*, 153 Ohio St. at 181, 91 N.E.2d 250. Nothing in the Home Rule Amendment prohibits the state from charging a fee for a service that it lawfully provides to a municipality. Quite simply, when the state imposes a fee for a service that is provided by the state, it is not exercising a power of local self-

government. Rather, it is recovering its own administrative costs for a service that (as the majority acknowledges) the Ohio Constitution authorizes it to perform.

{¶ 93} Indeed, as the majority concedes, there is nothing novel about the scheme at issue here. R.C. Chapter 5745 regulates municipal income taxation of electric light and telephone companies. Under that statute, these companies pay their municipal net-profits taxes to the tax commissioner and the tax commissioner charges a 1.5 percent administrative fee to defray the costs of administering the program. R.C. 5745.03(A). The scheme has been in place for 20 years, yet until today, no one has even suggested that it violates the Constitution.

{¶ 94} If further illustration of the flimsiness of the majority's reasoning is necessary, think about this. Under the majority's holding today, the legislature could completely prohibit a municipality from levying a net-profits tax, replace the municipal tax with an identical state tax, and keep every dime collected for the state coffers. But if the state instead determines to return 99.5 percent of the funds collected to the municipal government, according to the majority it has violated the Ohio Constitution. Does that make any sense?

{¶ 95} Indeed, by the majority's reasoning, the state could accomplish the exact same thing the majority finds unconstitutional if only the legislature would characterize the scheme a little differently. Instead of keeping .5 percent of the tax to cover administrative costs, the state could simply impose *an additional* .5 percent state net-profits tax on the taxpayer, and using its power of limitation, *lower* the corresponding municipal tax by .5 percent. The result would be the exact same for the state, for the municipality, and for the taxpayer. Yet under the majority's logic, this triumph of semantics over substance would be just fine.

{¶ 96} But the legislature need not go to these lengths. Nothing in the Ohio Constitution precludes the state from assessing the administrative fee at issue in this case. As a consequence, I respectfully dissent from the majority's judgment

finding the administrative fee unconstitutional. I concur in its judgment upholding the remainder of the scheme.

FRENCH, J., concurs in the foregoing opinion.

_____

Walter Haverfield, L.L.P., and Darrell A. Clay, for the Elyria appellants (case No. 2019-0693).

Frost Brown Todd, L.L.C., Eugene L. Hollins, Stephen J. Smith, Frank J. Reed Jr., Yazan S. Ashrawi, Thaddeus M. Boggs, and Matthew C. Blickensderfer, for the Athens appellants (case No. 2019-0696).

Roetzel & Andress, L.P.A., Stephen W. Funk, and Emily Anglewicz; and Eve Belfance, Akron Law Director, and Brian D. Bremer, for appellant city of Akron (case No. 2019-0696).

Dave Yost, Attorney General, Benjamin M. Flowers, Solicitor General, and Samuel C. Peterson, Deputy Solicitor, for appellees.

John A. Scavelli Jr., Wooster Law Director, urging reversal for amicus curiae city of Wooster.

Ohio Municipal Attorneys Association and Garry E. Hunter; and Paul W. Flowers Co., L.P.A., Paul W. Flowers, and Louis E. Grube, urging reversal for amicus curiae Ohio Municipal League.

Taft, Stettinius & Hollister, L.L.P., and J. Donald Mottley, urging reversal for amicus curiae Greater Dayton Mayors and Managers Association.

Dale R. Emch, Toledo Law Director, and John E. Bibish IV, urging reversal for amicus curiae city of Toledo.

Graydon, Head & Ritchey, L.L.P., Nicholas J. Ziepfel, and Roula Allouch, urging reversal for amicus curiae city of Trenton.

Mitchell H. Banchefsky, urging reversal for amici curiae local-government-law professors, International Municipal Lawyers Association, and International City/County Management Association.

Zaino, Hall & Farrin, L.L.C., Richard C. Farrin, and Thomas M. Zaino, urging affirmance for amici curiae Ohio Society of Certified Public Accountants, Ohio Chamber of Commerce, National Federation of Independent Business in Ohio, Ohio Realtors, Manufacturing Policy Alliance, Associated General Contractors of Ohio, Ohio Contractors Association, National Electrical Contractors Association, Mechanical Contractors Association of Ohio, Ohio Business Roundtable, Ohio Manufacturers' Association, Ohio Farm Bureau Federation, Ohio Council of Retail Merchants, ABC of Ohio, and Ohio Cable Telecommunications Association.

_____